583 A.2d 1044

**Anthony COLEMAN and Gregory Harris Givens**

**v.**

**STATE of Maryland.**

**No. 54, Sept. Term, 1990.**

Court of Appeals of Maryland.

Jan. 11, 1991.

588

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioners.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

CHARLES E. ORTH, Judge, Specially Assigned.

In these times, crimes of violence are often drug [1] related. This appeal involves drug related crimes. The case demonstrates the dominant extent to which the rampant illicit dealings in drugs have intruded, both flagrantly and insidiously, into the life of the community and the lives of the people. The invidious influence of drugs was fully appreciated by the Legislature when it enacted the Controlled Dangerous Substances Law, a comprehensive scheme inspired by the war against drug abuse. The General Assembly found and declared that

the illegal manufacture, distribution, possession, and administration of controlled dangerous substances have a substantial and detrimental effect on the health and general welfare of the people of the State of Maryland. It is the purpose of this subheading to establish a uniform law controlling the manufacture, distribution, possession, and administration of controlled dangerous substances and related paraphernalia in order to insure their availability for legitimate medical and scientific purposes, but to

---

**1.** In this opinion, "drug" or "drugs" refers to illegal controlled dangerous substances within the contemplation of Md.Code (1957, 1987 Repl.Vol.) Art. 27, §§ 276, et seq.

prevent their abuse which results in a serious health problem to the individual and represents a serious danger to the welfare of the people of the State of Maryland. Md.Code (1957, 1987 Repl.Vol.) Art. 27, § 276(a).

This case clearly shows that the unlawful purveyance of drugs is indeed a business, highly organized and ruthlessly and efficiently operated. The business here was headed by a chief executive officer who ran its daily operations, assisted by a number of lesser functionaries answering to him. The organization employed suppliers, dealers, and pushers, all working to entice new users and to supply those already hooked. The case explains the organization's marketing techniques—how the merchandise was stashed in various places to be readily available for distribution with the least risk of detection and thievery. There was even a logo, so that the product would be easily identified as that of the organization, thereby insuring the sanctity of the organization's territorial domain. Of significant importance was the organization's use of enforcers whose duty it was to keep all involved in line by actual or threatened physical punishment, which frequently took the form of the extreme sanction—death. It was this enforcement policy which made the duties of law enforcement authorities so difficult. The press has pointed out that the police are a necessary line of defense, but more is required. Those within and without the organization, employees and innocent bystanders alike, who become aware of matters which tended to jeopardize the business or to incriminate its personnel or to interfere with its daily operations all too often are afraid to come forward. The fear suffered by some potential witnesses renders them, in effect, deaf, mute, and blind. This reluctance to report to enforcement authorities or to seek their help or to testify in prosecutions is at the heart of the questions presented by this appeal.

I.

Delroy (Pappy) McNeil died at the age of 24 years about 4:00 P.M. on 25 April 1988 while sitting on the steps of the

Old Landmark Baptist Church at 818 N. Broadway in Baltimore City. According to the Post Mortem Examination Report, the manner of death was homicide, and the cause of death was three gunshot wounds of the head, chest, and abdomen. Investigation of the homicide culminated in the arrest of Gregory Harris (Black Greg) Givens, 17 years of age, and Anthony (Buddy) Coleman, 19 years of age. They were found guilty by a jury in the Circuit Court for Baltimore City of the first degree murder of McNeil, of conspiring to violate the murder laws of this State, and of the use of a handgun in the commission of a felony or a crime of violence. Judgments were entered on the convictions.[2] The Court of Special Appeals affirmed the judgments. *Coleman v. State*, 82 Md.App. 247, 571 A.2d 249 (1990). We granted the petition of Givens and Coleman for the issuance of a writ of certiorari and denied the State's conditional cross-petition.

Givens and Coleman seek a reversal of the judgments, claiming that the Court of Special Appeals erred in upholding two rulings of the trial judge:

 1) that "the trial court could withhold from the [defendants] until after the trial began, the names of the State's key witnesses"; and

 2) that "the trial court could prohibit defense cross-examination of the sole eyewitness on the question of whether he believed that he faced a mandatory sentence

---

**2.** Givens and Coleman were each sentenced to life imprisonment on the murder convictions. Givens was sentenced to 20 years on the handgun conviction consecutive to the murder sentence. Coleman was sentenced to 10 years on the handgun conviction consecutive to the murder sentence. Givens was sentenced to 30 years on the conspiracy conviction consecutive to the sentences on the murder and handgun sentences. Coleman was sentenced to 20 years on the conspiracy conviction concurrent with the murder and handgun sentences. Givens was also convicted of carrying a handgun and the docket entries read that he was sentenced to 3 years on that conviction concurrent with the murder sentence. The transcript of the proceedings, however, show that the carrying of a handgun conviction was merged into the use of a handgun conviction.

of life without parole, when he decided to implicate [the defendants] in these offenses."

They urge that these rulings by the trial court were not only erroneous but prejudicially so, in that they hampered the defense, intruding on it to the extent that they undermined it.

## II.

Md.Rule 4–263(b)(1) commands that upon request of the defendant, the State's Attorney shall

[d]isclose to the defendant the name and address of each person then known whom the State intends to call as a witness at the hearing or trial to prove its case in chief or to rebut alibi testimony; ....

Givens and Coleman made the required request. The State complied except for witnesses who had identified the defendants at a pre-trial identification procedure. The State declined to disclose those witnesses "at this time." The State sought support of its refusal by filing a motion for the issuance of a "Protective Order" authorized by Rule 4–263(i). The Rule prescribes:

On motion and for good cause shown, the court may order that specified disclosures be restricted.

The State's request for an immediate hearing on the motion was granted. There ensued a hotly contested plenary hearing.

The State tendered the showing of the required good cause through the testimony of two members of the Baltimore City Police Department—Detective Scott Keller of the Homicide Unit and Officer Thomas Marcucci of the Eastern Drug Enforcement Unit. At the time of the hearing, Keller had been a member of the Department for 12 years and for two years had been assigned to the homicide squad. During that period, he had investigated some 50 homicides of all different types, some involving drug organizations. Marcucci had been a member of the Department for over five years, during which time he had been involved in more than

500 arrests for violations of the narcotics laws. He testified:

> I have been able to conduct over 150 surveillances of actual hand to hand buys in the streets of Baltimore. I was able myself to make undercover purchases during and participate in the operation, Hollywood II, which was the undercover operation which involved video tape undercover buys using police officers.

After a probing review of his experience, training, and expertise, he was offered by the State as "an expert in the field of surveillance, identification, investigation of narcotics, and more particularly in this case, narcotic organizations." The court accepted him as an expert in those fields.

The picture painted by the two officers was appalling, all the more so because it reflected life on the street. What they depicted was within their personal experience. It was not lifted from the scenario of a TV series or the script of a movie or the plot of a novel, but was an actual accounting of events occurring in the real world, a part of everyday affairs in crime dominated neighborhoods. The residents of those neighborhoods are trapped in an anomie and have little chance of escape. They are the victims of a vicious circle. They are forced by fear and intimidation to accept an oppressive and onerous way of life. By reason of their fear and intimidation, the ability of law enforcement authorities to assist them is, to say the least, seriously hampered.

We give a compendium of the officers' testimony. The area around the 800 block of Broadway is

> a notorious place where drug deals are made. That's where all the users come to the median strip in Broadway to get their drugs.

John (Skeeter) Holt apparently considered the area to be the exclusive territory of a drug organization he headed. The organization maintained "stash houses" in the area. Its cocaine was stored in these houses. The narcotics were packaged in clear vials. The vials were distinguished by a pink cap. "The pink cap was the trademark of [the orga-

nization's] cocaine." Only the organization's cocaine was packaged with pink caps, and all the cocaine sold in the area by the organization had pink caps on the vials. This enabled the organization to control competition by assuring that only its drugs were being sold in the area.

Givens was a member of the organization. He played a dual role. He was a runner, one who sells drugs to users, and he was an enforcer, one who inflicts punishment on those who act contrary to the interests of the organization. He and Oswald (Pru) Trayham were responsible for "enforcing" in the organization. McNeil became the subject of Givens' enforcement duties. The organization was aware that McNeil "would sit for hours many times and watch" where the organization

> put [its] stashes and then he would go steal the stash of drugs and sell it for his own profit, which angered the drug dealers.

The organization's cocaine was "pure," but McNeil would "cut" it before selling it. Thus, McNeil's activities not only diminished the organization's income, they also damaged the organization's reputation for the quality of its merchandise.

Coleman, one of the higher-ups in the organization, took steps to assuage the anger by terminating McNeil's activities and, at the same time, providing an example to others who might be so tempted. He directed Givens "to go and take care of" McNeil. He provided Givens with a weapon. Givens found McNeil sitting on the church steps. In broad daylight, he went up to McNeil and shot him three times.

The brazen murder of McNeil was not the only illustration the officers gave of the manner in which the organization attempted to preserve its territory and to protect its interests. The murder of one Maurice Ireland was traced to Givens. Ireland, fresh out of jail, was owed money by Holt, apparently for some drug deal. He was "very pushy for his money [about $5000] to be paid back...." At one point, "[h]e forcibly tried to get his money back ... and as a result his murder was ordered." He was executed about a

block from where McNeil was slain. Givens was charged with the murder of Ireland.

The media—press, radio, and television—provide clear indication that the extreme sanction employed by the drug organization here is not unusual. A harkening of the news reports shows that unlawful drug organizations often use that means to preserve the territory they have adopted, to enforce what they consider to be their rights, and to protect their interests. The impact of this on enforcement functions, Keller explained, is that there is great difficulty in locating witnesses who will cooperate with authorities in drug related offenses.

[Witnesses] are very candid, usually that they don't want to be involved because they fear that they will be hurt in retribution for any information that they would give to us. They fear the people that are involved in the murder and they will not give us a statement, let alone come to court and testify.

The officer emphasized:

These cases are usually very, very difficult to make an arrest on, very difficult because there is a low level of cooperation in the community because of the fear in the community. They fear these people. These people rule the communities through intimidation and, you know, these are citizens that just—they don't want to be the next one laying out there in this street with nobody coming forward to testify for them.

The police did, however, receive information from the witnesses who were the subject of the protective order, one of whom was an eyewitness to the shooting. It was

specific information, and identification of Gregory Givens, a positive identification of Gregory Givens was made as the shooter of Delroy McNeil. Also, there was information given relative to a conversation that was, that happened between Anthony Coleman and Gregory Givens just prior to the shooting of Delroy McNeil and also there

was information as to actions of both individuals, what they did right before the shooting.

The witnesses agreed to testify in court, but not without reservations. Keller said:

The reservations are quite obvious. The biggest concern they had when I interviewed them was their personal safety. They are in extreme fear. They feel that if their identity is revealed that they would have to have 24 hour guard around the clock, but they feel like their life would not be worth a nickel. That's their words, extremely difficult to get people to come forward like this in these particular type cases and to give this kind of information and even more difficult, when you do get the information, for people to want to remain anonymous and not testify in court.

The officer observed that it is

[v]ery unusual for a person to put themselves this up front, so to speak, and be willing to go before the Baltimore City Grand Jury and come into a courtroom in front of whoever chooses to come in here and testify against an individual like this, an individual who is already indicted on two murders.

Keller pointed out that although Givens was in jail pending trial on Ireland's murder, Oswald (Pru) Trayham, the organization's other enforcer, was still on the street. Also police investigation indicated that Coleman was "sending emissaries from the Baltimore City Jail to issue harm to any of [the State's] witnesses." Questioned as to the basis of the witnesses' fear that they would be killed, Keller said:

Because of the prior activities of this drug organization. People that have been shot and people that have been shot and killed. There are also people that have just been shot and have not died because they have crossed this particular drug organization and their death was ordered.

He explained:

Now, in some particular instances the murder wasn't complete. The person didn't die because the hospital

saved them. They believe that if their identity is made known to this drug organization they are not safe wherever they may be, whether it be under our protection.

The court remarked that this would be true even after they testified and the case was over. Keller responded:

Yes, it would be true. That's true. Correct. To be quite candid, Your Honor they are hoping that once the case is over the persons being tried will be incarcerated and then we would provide [the witnesses] with a means of leaving this area.

The judge inquired if the police would provide the witnesses with new identities. The officer replied the police did not have that capability, but, combined with the State's Attorney they would "do everything we can to help them leave the area."

Givens and Coleman did not offer evidence. They relied on the insistent objections made by their counsel during the course of the State's direct examination of the officers, and on their counsel's probing cross-examination and zealous arguments. The hearing judge obviously determined that the officers' testimony was credible. She concluded that the fears for the safety of the witnesses were well warranted. She weighed the testimony of the officers and found that "the State has shown sufficient evidence that the lives of the witnesses may be endangered." The judge expressed reluctance "in hampering the defense in any way in the preparation of their case," but, she concluded, "I cannot deny this motion." She suggested, however, that any burden that non-disclosure may place on the defense could be allayed by making the names of the witnesses available to defense counsel two weeks prior to trial, and by arranging that defense counsel could then question the witnesses out of the presence of the State's Attorney. But defense counsel were forbidden to disclose the identity of the witnesses to Givens and Coleman or any other person. In any event, the witnesses' identity would become known when they were called by the State to testify at trial. The hearing judge made clear that she would

consider at any time prior to trial any reasonable request that is made for time to pursue follow-up to any information that is obtained as a result of the interview.

She emphasized, "I am open at any time to considering reasonable requests from the defense for more time, more access or any other reasonable request." She pointed out:

I am still in control of this particular Order so that I can certainly modify it in the way that I have indicated to you that I would.

She issued an order which was in accord with her suggestions. It read:

Upon a hearing in open court on September 28, 1988 all parties having been present, it is this 15th day of November, 1988 by the Circuit Court for Baltimore City, State of Maryland,

ORDERED, that pursuant to Maryland Rule 4–263(c)(3), (i) and good cause found, the State shall not provide the defense with the names and addresses of any civilian witnesses, and shall provide only the name(s) of any such witness(es) two weeks before the day of trial.

It is further ORDERED, that the State shall provide defense counsel an opportunity to question any such witness(es) two weeks before trial at a place to be designated by the State's Attorney's Office within the confines of either of the City Court Houses and at a time to be set by the State's Attorney's Office. The State's Attorney's Office through its representative shall advise any witness(es) the reason for the meeting with defense counsel and that they, the witness(es) may talk to defense counsel or that they may refuse to talk to defense counsel but the State's Attorney or his representatives shall not remain at the interview and,

It is further ORDERED, that after such disclosure, counsel for the defendants or their agents shall not directly or indirectly disclose the identities of the State's witness(es) to anyone.

It is ORDERED, that the State shall provide a copy of a criminal record (if one exists), any statements or any grand jury minutes (if any exist) for any such witness(es).

Subject to further order of the Court.

## III.

Givens and Coleman were tried together before another judge. When the case was called, defense counsel attacked the protective order. There was no suggestion that there had been other than full compliance with the order on the part of the State, and it did not appear that defense counsel had requested the hearing judge to grant additional time to pursue any information obtained at the interview of the witnesses. Nevertheless, defense counsel moved to dismiss the indictments. They claimed that, because of the protective order, the defendants had been denied their right of confrontation, had not been afforded due process, and had been deprived of fundamental fairness. The rationale of those claims, advanced and argued by Givens' counsel (who had not participated in the hearing on the motion for the protective order) and adopted in toto by Coleman's counsel, was that "the State's whole case is going to rise and fall on the two witnesses who are being protected by this protective order." Not until the trial had commenced would the defendants be apprised of the identity of the witnesses so that defense counsel could ask the defendants "what do you know about this person, what dealings do you have with this person, who else knows about these dealings with this person, where can I find these other people who may or may not know about these things." Furthermore, Givens' counsel asserted:

I don't have a hundred person law firm. I can't send a couple of associates out or send some investigator out to take care of this case, investigate it as the case goes on like they do in TV and they come up with all these wonderful things. In real life that doesn't work because of the practicality, [the] effects of being in a business and

only having twenty-four hours a day and only being able to work so many hours that day.

The trial court appreciated the defense's problem. He interpreted counsel's remarks to indicate that counsel was troubled because the

[m]ost important part of the State's case you cannot discuss with your client, get any input from your client to see if your client may have information that could lead you to other information that may be helpful in your defense.

The court believed that the "issue goes to fundamental fairness and the right of the defendants to receive a fair trial." The Assistant State's Attorney recognized, of course, that the defendants had a right to a fair trial, but, he observed, "a balancing act" is involved also, and, he declared, "the witnesses for the State have a right to life, and, that is, in fact, the key issue here." Coleman's counsel added that if the court did not dismiss the indictments, he would request that

we be given a great deal of latitude timewise in order to chase down whatever leads come out during the testimony, if any do come out, and in conferring with our clients.

The court agreed with the State's position that balancing was involved. The court said that it

has to certainly balance the right of the State to put on its case and the right to life of the State's witnesses against the right of the defendants to have a fair trial and to be able to prepare for their trial.

Under the circumstances, the court concluded, the balance tipped in favor of the State. The court denied the motion "at this point." The court, however, also acceded to the suggestion of defense counsel. The judge made plain that

after the cat is out of the bag or, in other words, after the witnesses have testified, if counsel for the defendants, as officers of the Court, find that there is a need for a day or two to track down additional witnesses, or to do further investigation to determine any possible motive or

bias on behalf of these witnesses, the State's witnesses, then I will certainly permit that under the circumstances of this case.

The trial proceeded in due course.

## IV.

### A.

■■■■■ The general rule controlling the disclosure of the State's witnesses is, as we have noted, spelled out in Rule 4–263(b)(1). When requested, the State's Attorney must give the defendant the names and addresses of each person he intends to call as a witness to prove his case in chief.[3] Rule 4–263, however, contains a significant exception. Section (c) provides that the Rule does not require the State to disclose certain matters to the defendant. It designates two of such matters: in paragraph (1) work products of the State's Attorney, and in paragraph (2) confidential informants (*see* note 3, supra). Paragraph (3) is a catchall. It excludes

> [a]ny other matter if the court finds that its disclosure would entail a substantial risk of harm to any person outweighing the interest in disclosure.

---

**3.** The general rule ordinarily does not apply to informers. For the definition of an informer *see Nutter v. State,* 8 Md.App. 635, 637 n. 1, 262 A.2d 80 (1970).

Under the title "Matters Not Subject to Discovery by the Defendant," Md.Rule 4–263(c)(2) provides that the Discovery Rule does not require the State to disclose:

> The identity of a confidential informant, so long as the failure to disclose the informant's identity does not infringe a constitutional right of the defendant and the State's Attorney does not intend to call the informant as a witness....

The judge hearing the protective order motion correctly indicated that even if the witnesses here were deemed to be informers, the State's Attorney ordinarily would still have to disclose them because the prosecution intended to call them as witnesses in its case in chief. *See Brooks v. State,* 320 Md. 516, 578 A.2d 783 (1990). When an informer becomes a witness, he emerges from the netherworld into the open, shed of his cloak of invisibility.

The hearing court concluded that unrestricted disclosure of the witnesses would entail a substantial risk of harm to them, outweighing the interest in disclosure. The trial court reached the same conclusion. We examine the propriety of those conclusions.

We last entered the area of disclosure to the defendant in *Brooks v. State,* 320 Md. 516, 578 A.2d 783 (1990). The concern of that case was the identity of police informers, but much of what Chief Judge Murphy said for the Court is apropos this case.

The privilege of the State to withhold certain matters from defendants in criminal causes has long been recognized, not only in Maryland but throughout the country. *Id.* at 522, 578 A.2d 783. The privilege is especially important in the enforcement of narcotic laws, since it is most difficult to obtain evidence for prosecutions; there are rarely complaining witnesses. *Id. See McCray v. Illinois,* 386 U.S. 300, 312, 87 S.Ct. 1056, 1063, 18 L.Ed.2d 62 (1967). The manifest importance of the State in non-disclosure is "necessarily circumscribed by the defendant's interest in a fair trial." *Brooks,* 320 Md. at 522, 578 A.2d 783. The privilege of non-disclosure must ordinarily give way where disclosure is essential to a fair determination of a cause. *Id.* at 522–523, 578 A.2d 783, citing *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1957). Trial judges are required "to balance the public interest in protecting the flow of information against the individual's right to prepare a defense." *Brooks* 320 Md. at 523, 578 A.2d 783.

"Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

*Id.,* quoting *Roviaro,* 353 U.S. at 62, 77 S.Ct. at 629. "[T]he balancing test should be applied in all cases." *Brooks,* 320 Md. at 525, 578 A.2d 783.

[T]he key element is . . . the materiality of [the witness's] testimony to the determination of the accused's guilt or innocence balanced against the State's interest in protecting the identity of the [witness].

*Id.* "The decision to compel disclosure . . . is within the sound discretion of the trial court." *Id.*

## B.

## 1.

 The importance of the testimony of the protected witnesses was made perfectly clear by the police officers at the hearing. Without the testimony of the witnesses, the charges against Givens and Coleman simply could not be proved. On the other hand, the hearing judge was convinced that the life of any State witness was in danger once the witness was identified. In the light of the evidence before her, which she found to be credible and worthy of heavy weight, we cannot say that her judgment thereon was clearly erroneous. Md.Rule 8–131(c). She then applied the proper test to the evidence, balancing the interest of the State and the interest of the defendants, and, exercising her discretion, decided that the interest of the State outweighed that of the defendants. This was a fair balance. But she did not leave the defendants hanging to twist in the wind. She made it possible for defense counsel, but no one else, to obtain the name and address of each undisclosed witness two weeks before the trial, for defense counsel to question them at that time out of the presence of the State's Attorney, and for the State to supply defense counsel with a copy of any grand jury minutes and any criminal records of the witnesses. All of this was subject to her further order, and she emphasized that she would at any time consider any reasonable requests from the defense for more time to follow leads that surfaced when the identity of the witnesses was made known to defense counsel. Thus, the hearing judge protected both the interests of the State and the interests of the defendants in every reasonable way. We think that the exercise of her discretion was true and

proper. We hold that the issuance of the protective order was not an abuse of discretion.

### 2.

 Our determination that the protective order was proper in the circumstances supports our notion that the trial judge did not err in denying the motions to dismiss the indictments. As did the hearing judge, the trial judge recognized the interests of the State and the interest of the defendants. Although the proceedings on the motions to dismiss were not plenary, the State pointed out that the matter of the protective order had been fully litigated. We note that there was no proffer of evidence, testimonial or otherwise, at the dismissal proceeding. The trial judge balanced the conflicting interests of the parties in the frame of reference of the constitutional rights of confrontation and due process and the concept of fundamental fairness. He concluded that the State's interests dominated. This was a proper balance. On our independent constitutional appraisal of the confrontation and due process claims, we see no constitutional violation in the circumstances. The trial judge, as did the hearing judge, left the door ajar. He assured that he would allow time for defense counsel to make any further investigation found to be advisable as a result of the testimony of the witnesses at trial. We see no fundamental unfairness in the denial of the motions to dismiss. Our view is bolstered by the fact that the record before us does not disclose that the defendants requested time to conduct further investigation, either of the hearing judge before trial, or of the trial judge during the trial.

We hold that denial of the motions to dismiss was not erroneous.

### V.

### A.

Louis Wesley Jackson, 30 years of age, was one of the witnesses covered by the Protective Order. He was the

eyewitness to McNeil's murder. His name was publicly revealed for the first time in the State's opening statement to the jury.[4] Not only his identity was revealed at the trial, however. The protracted direct examination of him and the strenuous cross-examination of him afforded ample opportunity for the jury to ascertain the true character of the man who stood before them and to judge his credibility. He testified without reticence or reservation. He was articulate. He was steadfast in recounting what he had seen, clear in describing his reactions thereto, open in explaining the motivations which prompted him to testify, and frank as to his past criminal activities. In its closing argument to the jury, the State indicated that Jackson radiated sincerity.

> He was telling the truth. Every way, shape and form, everything he said about him he was telling the truth. He answered questions more fully than they were asked. He gave you more color about his own troubles, about his own impeachable record than counsel even asked. You see he has nothing to lose. He is telling the truth.

We cannot say that the jury, in fulfilling its function as the trier of fact, went astray in accepting this appraisal.

We glean from Jackson's testimony at the trial on the merits that he visited Holt's domain in the 800 block of Broadway daily to buy cocaine from the organization to sell and distribute to users. He was there when he saw McNeil's murder, and "was scared to death." He stayed away from the area and tried to avoid the members of the organization. Two attempts from a passing car were made to shoot him down with a machine pistol. He was unable to see the participants in the first attempt (he was too occupied in saving his life), but he was sure the second attempt was by Givens, Coleman, and Trayham. He avoided the area in which the organization operated. He did not go home. He stayed for a while in Annapolis and then in Cherry Hill. "Everywhere I stayed," he said. "Anywhere

---

4. The trial court forbade the State to mention to the jury that Jackson was under the aegis of a protective order.

but East Baltimore. Anywhere [except] where I might be seen by them." Then, in June 1988, he was arrested and charged with a series of burglaries and related crimes. He decided to tell the police what he knew about the McNeil murder. He said:

> I had been running [scared] for weeks and weeks.... I was tired of running and I knew one day I would have to be on the street again and I just didn't want did to me what they did to that boy on the church steps.... That's where he was murdered at right there.

He testified before the Grand Jury. He disclaimed that a deal had been made when he went before that body.

> They hadn't promised me they would offer me any deals like; and [the Assistant State's Attorney] told me they couldn't offer me any deals or anything, and I told him in return I didn't want nothing but to be safe from those two guys, until those two guys were put away. It was simple as that. That is all I wanted. I didn't ask for anything, they didn't give me anything.

There is nothing in the record to indicate that Jackson underwent a change of heart, but, in any event, at the time of the trial, the State had solidified his cooperation by negotiating and consummating a plea bargain with him. Pursuant to the agreement, he pled guilty to two of the pending burglary charges and received two concurrent 18 month sentences. Other charges were nol prossed.[5]

The jury learned that Jackson was in fact a professional criminal with an "extensive record." His criminal career began at the age of 14 years. "Ever since I was a juvenile I been in trouble." Without prodding, he brought out that on his record were "35 or 40 charges from juvenile on up to adult." He had been "going to prison" for almost half of his 30 years. His forte was burglary, as that word is

---

**5.** Defense counsel pointed out that Jackson had filed a petition to modify the sentences and suggested that the sentences would be suspended if he testified truthfully at the Givens–Coleman trial. Jackson denied that there was such an understanding.

commonly used to describe the variety of breaking and entering offenses. He was an expert in that field, although apparently not too successful in avoiding apprehension, even discounting the break-ins he may have committed without being caught.[6] His expertise was not confined to a modus operandi of breaking and entering. His frequent appearances in court had made him aware of the possible consequences upon conviction of those crimes. Defense counsel brought out his knowledge on cross-examination. The transcript of the proceedings reads:

Q You know a burglary carries a maximum penalty of I think ten years incarceration?

A It depends on the burglary.

Q It depends on the burglary?

A Yeah. One carried eighteen, one carry twenty, one carry twenty-five so I know.

Q You are familiar. I know who to get advice from if I ever have a burglary. Now, so you know what the penalties are for burglary?

A Yes.

Q Sir, daytime housebreaking and nighttime housebreaking, you know what the penalties are, is that correct?

A Yes, sir.

Defense counsel addressed the charges brought against Jackson upon his arrest after McNeil's murder. He asked Jackson: "You know how many years you were facing on all of those charges?" Jackson answered: "Yeah, if I was found guilty on them I would have had a whole bunch of years."

---

6. Jackson emphasized that his criminal activities were confined to "theft charges, just thefts and burglaries. Storehouse burglaries, thefts." He proclaimed his otherwise peaceful nature. He said that he had not engaged in any violent crimes on the person:
I never had no, you know, attempted murder or murders or assaults, nothing like that.

On Jackson's past convictions and incarcerations, the State could have sought, in connection with the charges brought on his June 1988 arrest, a sentence of life imprisonment without the possibility of parole. Code, Art. 27, § 643B; Md.Rule 4–245. Out of the presence of the jury, defense counsel requested that they be permitted to ask Jackson if he was aware that the possibility of a mandatory life sentence without parole was hanging over his head at the time he agreed to testify for the State. They urged that "the jury is, in all fairness ... entitled to know how good was the deal this man got.... The jury should know just how sweet it was." As we read defense counsel's argument, they suggested that the plea bargain provided a strong motive for Jackson to supply much needed testimony against Givens and Coleman, especially when buttressed by the possibility of a mandatory life sentence without parole. Such motivation, they declared, would tend to render Jackson's credibility questionable and his testimony suspect in the eyes of the jury. The Assistant State's Attorney disagreed "wholeheartedly" as to the mandatory sentence question. He proffered evidence that the State's Attorney for Baltimore City has "traditionally" followed a policy that the mandatory sentence provisions would not be applied to "crimes such as burglary or daytime housebreaking...." He pointed out that as former Assistant State's Attorneys defense counsel were aware that this was so. He charged:

> They clearly know and they are trying to misrepresent to the court that this is an unusual case when, in fact, Your Honor, they both know that it is the usual case [not to proceed under the subsequent offender statute in these circumstances]. It is a policy decision.

The judge ruled:

> I will permit you to ask with the proper foundation the offenses that he was convicted of or pled guilty to, or whatever. I will also permit you to ask if he knows what the statutory sentence is for those offenses, and that's it.

The only way that any other considerations will be permitted is if you have an indication that a mandatory was filed. Other than that, no.

It was this ruling that prompted the second question presented on certiorari.

### B.

 Cross-examination of a witness is a matter of right. *Beasley v. State,* 271 Md. 521, 529, 318 A.2d 501 (1974). It is central to our accusatorial system of criminal justice, and serves as an invaluable tool to each side in the search for the truth. *State v. Cox,* 298 Md. 173, 178, 468 A.2d 319 (1983). It may be used for impeachment purposes, *Thomas v. State,* 301 Md. 294, 308, 483 A.2d 6 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985), and, as a general rule, a witness may be cross-examined on such matters and facts as are likely to affect his credibility, *Cox,* 298 Md. at 178, 468 A.2d 319. The right, however, is not absolute. *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). We have consistently held that trial courts are vested with wide discretion in ruling upon the propriety of questions on cross-examination. *Beasley,* 271 Md. at 535, 318 A.2d 501. *See Robinson v. State,* 298 Md. 193, 201, 468 A.2d 328 (1983). "This discretion is exercised by balancing 'the probative value of an inquiry against the unfair prejudice ... that might inure to the witness....' " *Lyba v. State,* 321 Md. 564, 570, 583 A.2d 1033 (1991), quoting *Cox,* 298 Md. at 178, 468 A.2d 319.

Jackson's testimony placed foursquare before the jury his fear of Givens and Coleman and the organization's vengeance. The jury was made aware that he had been on the run in an attempt to avoid retribution, and that he was tired of running, recognizing that sooner or later the organization would bring him to bay in any event. His arrest provided the opportunity to seek police protection. Without the cooperation of the authorities, even his imprisonment in

an institution under the usual routine would not place him beyond the reach of the long arm of the organization. So he sought their cooperation by agreeing to testify against Givens and Coleman. Moreover, it was made plain to the jury that the State, even assuming that it did not, in the first instance, induce Jackson's testimony, made certain that he would testify by entering into a plea agreement with him. And the jury was informed of the terms of the agreement—the assurance of imprisonment for not more than 18 months, as opposed to the possibility of imprisonment for much of the remainder of his natural life, even without the invocation of the mandatory sentencing statute. Defense counsel's cross-examination established that he was well aware of such a possibility. Furthermore, Jackson's extensive criminal record was described to the jury, and it is firmly established that the type of crimes of which Jackson had been convicted may be deemed to reflect adversely on his truthfulness and on his interest in testifying. Md.Code (1973, 1989 Repl.Vol.) § 10–905 of the Courts and Judicial Proceedings Article; *Prout v. State*, 311 Md. 348, 363, 535 A.2d 445 (1988). The accumulation of all of these matters certainly tended to make Jackson's credibility questionable and his testimony suspect in the eyes of the jury. It placed into the grist ingredients which, when ground by the jury, left a product which provided the jury with ample opportunity to make a reasoned determination of Jackson's truthfulness vel non and of the trustworthiness of his accounting of McNeil's murder.

■ Defense counsel wanted even more. As we have seen, they requested that they be permitted to ask Jackson "whether he believed that he faced a mandatory life sentence without parole when he decided to implicate [Givens and Coleman in the homicide]." An admission from Jackson that he harbored such a belief, defense counsel suggested, would indicate to the jury "how good was the deal this man got ... how sweet it was." If the defense was successful in eliciting from Jackson that he was aware of the possibility of a mandatory life sentence being imposed

on him, the acknowledgment would not be of such significance, considering all of the surrounding circumstances, to tip the balance against his credibility. The acknowledgment, in the light of all the other evidence tending to demonstrate Jackson's motives in testifying, to show his bias, to reflect his interests, and otherwise to impeach his credibility, would be of minimal significance, if any at all, and certainly would not be essential for the jury to appreciate fully the "sweetness" of the deal made by the State to encourage him to testify. Moreover, had the question been permitted, the State could have shown that, in any event, it was the long standing policy of the State's Attorney for Baltimore City not to seek such a sentence when the crimes involved were of the type charged against Jackson. We note that there was no suggestion that the State had sought a mandatory life sentence without the possibility of parole in its prosecution of Jackson.

We do not believe that the defense was prejudicially harmed by the judge's stricture of cross-examination, and we are no more convinced to the contrary than was the judge by defense counsel's bloviating. On the totality of the circumstances, we hold that the refusal of the judge to permit this specific question was not an abuse of his discretion.

## VI.

We have held that the Circuit Court for Baltimore City did not err in issuing the Protective Order, or in denying the motions to dismiss the indictments, or in restricting the cross-examination of Jackson. It follows that the affirmance of the Court of Special Appeals of the judgments of the circuit court was not erroneous. We affirm the judgment of the Court of Special Appeals.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED;

COSTS TO BE PAID BY PETITIONERS.