948 A.2d 102

**Jovon Brian LANCASTER**

v.

**STATE of Maryland.**

**No. 01007, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

May 9, 2008.

**4**

Benjamin Miller, Assigned Public Defender, for appellant.

Steven L. Holcomb (Douglas F. Gansler, Atty. Gen., on brief), for appellee.

Panel: ADKINS, BARBERA and WOODWARD, JJ.

ADKINS, J.

In this appeal we examine the conflict between a criminal defendant's constitutional right to a zealous defense and the State's legitimate concern for the safety of its witnesses. We are asked to decide whether appellant Jovon Brian Lancaster was denied his constitutional rights to counsel and a fair trial by a pre-trial protective order that required defense counsel to delay disclosing to him until the day of trial the names, addresses, and statements of certain prosecution witnesses.

A jury in the Circuit Court for Montgomery County convicted Lancaster and his brother of two counts of robbery with a dangerous weapon, two counts of second degree assault, one count of first degree robbery, and one count of conspiracy to commit robbery with a dangerous weapon. Lancaster challenges these convictions, raising two related issues arising from the protective order:

I. Did the [motion court] abuse [its] discretion by granting a protective order that prevented defense counsel from disclosing to appellant until the start of trial the names and statements of key witnesses and also allowed the State to withhold from defense counsel the location of certain witnesses, when the State failed to produce sufficient evidence that full disclosure of this information presented a substantial risk of harm to any potential witness?

Did the hearing [court's] abuse of discretion in granting a protective order interfere with the ability of trial coun-

sel to conduct a defense and communicate effectively with the appellant resulting in the denial of the appellant's right to counsel under the Sixth Amendment of the United States Constitution and Art. 21 of the Maryland Declaration of Rights?

In the circumstances presented here, we conclude that there was neither abuse of discretion nor constitutional error.

## FACTS AND LEGAL PROCEEDINGS

### The Crimes

At trial, the State presented evidence that Jovon Lancaster and his co-defendant brother, Pablo Guillermo Lancaster, were involved in a series of drug-related incidents that culminated in a home robbery.[1] On July 13, 2005, Michael Ford and Jason Friday used a counterfeit $100 bill to buy ecstasy pills from "Sukie," Jovon Lancaster's girlfriend, who lived across the street from Ford's house at 17909 Shotley Bridge Place in Olney. The next morning, July 14, Sukie called Friday to complain about the counterfeit money. When Friday rebuffed her, she told him that two drug dealers were coming to his house.

A couple of hours after Sukie's call, two men, whom Friday later identified as Jovon and Pablo Lancaster, visited Friday's home. Friday's father escorted them into the home. The pair demanded money for the prior night's transaction, and asked Friday to "step outside" when his father "kept asking what was going on." Friday went to the porch, and promised them that he would give them the money when he had it. The pair left, but came back to get Friday's phone numbers. Once inside, one of them picked up Friday's cell phone from the table and left with it.

------

**1.** We shall refer to the Lancasters as Jovon and Pablo when necessary to avoid confusion.

Pablo noted a separate appeal, raising, *inter alia,* the same challenge to the pre-trial protective order. *See Pablo Lancaster v. State,* No. 990, Sept. Term 2006, 2007 WL 3054504 (submitted on brief Sept. 2007).

Michael Ford also received a call from Sukie on the morning of July 14. She was "angry, upset and confused." Ford exchanged calls with Friday, telling his friend that he was not going to give him any money, at which point the call terminated abruptly. Shortly thereafter, Ford received another call from Friday's cell phone. When Ford answered, an unknown male said, "You got our money." In a second call, the same man said he was on his way to Ford's house. Minutes later, the same caller informed Ford, "I'm outside."

Ford enlisted his brother C.J.'s help, and together they walked out to the car parked on the street in front of their house. Two men identified as the Lancasters sat in the car. They told him that Friday gave them fake money and that Friday sent them to him. During the encounter, Michael Ford called Friday's cell, which rang in the possession of the man in the back seat, who identified himself as "Juvenile."

Over the next several days, Ford received at least five calls from the same man demanding repayment and/or asking where to find Friday. On July 18, Ford received three calls from the same caller, again demanding payment. On the third call, the caller said, "I'm on my way to your house."

Presently, a group of men, some wearing masks and carrying firearms, came to the Ford home. The Lancaster brothers were part of this group; neither was masked and both carried handguns. Neither Michael Ford nor his mother Rosetta Ford were home at the time. Michael's brothers C.J. and Deandre were outside. The men patted them down, brandished a shotgun, then directed them inside, where the Lancasters took their wallets, cell phones, and money. The robbers seated both brothers on a couch with an unidentified woman, where they remained while the robbers went through the house, taking two stereos, jewelry, and clothes.

Upon returning home after her night shift, Rosetta Ford learned what happened and reported the incident to police. On August 26, 2005, Pablo and Jovon Lancaster were arrested for robbery and related crimes.

## Hearing On Protective Order

On December 15, 2005, the State moved for a protective order, seeking to withhold from the Lancasters and their counsel the current location of victim witnesses, and to prevent defense counsel from sharing with their clients before trial the names, criminal records, prior statements and grand jury testimony of certain non-victim civilian witnesses (the "protected witnesses"). Defense counsel filed written opposition to the motion.

At a January 12, 2006 hearing on the motion, the State explained that it was seeking protective orders with respect to three different categories of witnesses: (1) victims; (2) non-victim eyewitnesses, *i.e.*, persons who participated in the crime with the Lancasters; and (3) other fact witnesses who were neither victims nor eyewitnesses, *i.e.*, persons who had information that tied the Lancasters to the armed robbery but were not present while it was committed.

The State presented the testimony of Det. Eric A. Mason, the "primary investigator," as grounds for the protective order. Mason had been assigned to the robbery section of the Montgomery County Police Department's major crimes unit for one year; he had 24 years experience in the Department before that. On direct examination, Mason testified that some witnesses feared retaliation by the Lancasters:

[Prosecutor]: How many witnesses would you say you've interviewed in the course of your investigation of this crime?

[Det. Mason]: Numerous, I would probably say, ballpark of maybe ten.

Q: Okay, and of those witnesses have any of them expressed any concerns regarding their involvement in the case, talking to you, et cetera?

A: Yes, sir.

Q: Okay. What kind of concerns on a generalized fashion [have] those witnesses articulated to you?

**A: Fear that retaliation will be made against them. Fear that they would come to their homes. . . . That they knew where they lived at. . . .**

Q: And is the fear specific to the two defendants or is it to go to known associates of the defendants as well?

A: The defendants and their associates.

Q: Okay. And **within these ten witnesses is there a smaller group of those witnesses who expressed particularized fears because of specific threats they've perceived from these defendants?**

A: **Yes.** (Emphasis added.)

When counsel for both Lancasters expressed concern about their ability to cross-examine the protected witnesses regarding the allegation of specific threats, the prosecutor assured court and counsel that full disclosure of the identities, prior statements, and criminal records of all witnesses, including the protected witnesses, would be made to defense counsel as soon as the hearing concluded.

The State then proceeded with its direct examination of Det. Mason regarding the protected witnesses:

[Prosecutor]: This subset of witnesses . . . have they told you about specific threats they've perceived from the defendants?

[Det. Mason]: Yes.

Q: Okay. And **has this subset of witnesses perceived those threats to be in relation to their potential participation in this matter, and your investigation?**

A: **Yes.**

Q: . . . . The crime charged, . . . . allegation involves a home invasion, correct?

A: Yes, sir.

Q: And does it involve people in addition to the two defendants here?

A: Yes.

Q: Okay. It involves, in fact, five or six people, correct?

A: Yes.

Q: And is there an allegation that firearms were involved in that home invasion.

A: Yes.

Q: Okay. And are you aware of other violent conduct by the two defendants that has been charged against them?

A: Yes....

Q: Has that violent conduct involved firearms?

A: Yes....

Q: Do you know if that violent conduct that involved firearms has resulted in indictments against the two defendants?

A: Yes.

Q: Okay. And is it for a carjacking for both of them?

A: Yes.

Q: And armed robbery for both of them?

A: Yes, sir.

Q: Okay. And are you aware about the subset of witnesses that we're talking about, are they aware of that conduct by the defendants?

A: Yes.

Q: And **this subset of witnesses, ... have they made known to you their awareness of other violent conduct by the defendants?**

A: **Yes.** (Emphasis added.)

On cross-examination, defense counsel established that some of the protected witnesses have a criminal background and that Det. Mason interviewed each witness independently from the others. Counsel then unsuccessfully attempted to question Mason about the specific nature of the alleged threats against prosecution witnesses. Counsel for Pablo Lancaster asked the detective, "Can you give me a detail of what they perceived as a threat. What articulable fact they would have had, that they could have perceived as a threat?" The prosecutor objected, arguing that "the response to that question is going to further any attempt by the defendants to identify this witness." The court suggested that the question be re-

phrased, noting that "it is a fair concern that" information regarding "the substance of the threats" could "allow a determination as to ... the identity of those individuals." Defense counsel then continued:

[Counsel for Pablo Lancaster]: This is rather ethereal here but let me ... try it this way.... [Y]ou were not personally present during any threats made to any of these subset of witnesses, correct?

[Det. Mason]: No.

Q: So, you would have heard that they perceived the threat, correct?

A: Yes.

Q: **Were any of them direct contact with either one of these two defendants?.... [D]id they say that, to you, it was made directly by one of these two gentlemen?**

A: **One of them, yes.**

Q: And.... which one of the defendants ... ?

[Prosecutor]: And I'm objecting.... I think we've established a very fine perimeter around what this threat is specific threat

[sic], the witness perceived it, and perceived it from one of the defendants. I think any question beyond that is going ... too close to the identification of who these witnesses are.

The Court: All right, I'll sustain the objection.

[Counsel for Pablo Lancaster]: **Can you tell me a little bit more about the nature of the threat, verbal, look, glance, shrugged shoulders, pointing fingers, telephone call, letter, what's the nature of the basis of their perceived threat?**

A: **Verbal.**

Q: Okay. And would the answer be the same if I asked you **what their perceived threat was from, what you call, associates of the defendants?**

A: Just prior history.... **It's just prior history of know-ing of the group they hung with. What they are capable of doing.**

Q: Okay, so they're telling you I've been involved with these people in the past then basically, I guess, I'm afraid of them in the future, right?

A: Basically, yes, sir.

Q: Okay. Now none of these people was hurt or harmed in any way up to the time you talked to them and you testified in court today.

A: Not that I know of.

Q: **Nobody had to move, at least these witnesses, or anything?**

A: It depends on what witnesses you're talking about. **Yes, some of them moved.** (Emphasis added.)

Next counsel for appellant Jovon Lancaster continued the cross-examination of Det. Mason. After establishing that Mason was not aware of "any threats by the associates," defense counsel attempted to learn more about the threat allegedly made by one of the defendants. He asked when that threat was made, and whether any threat had been made while both defendants were incarcerated pending trial. The court sustained objections to both inquiries, despite defense counsel's insistence that this information "goes to their dangerousness." Cross-examination continued:

[Counsel for Jovon Lancaster]: When the home invasion allegedly occurred, the invaders said things to the victims, in the home, correct?

[Det. Mason]: Yes.

Q: ... **The threat, is it from an event other than that conversation?**

A: **Yes**....

Q: The people that said that they were concerned about threats from the associates, from retaliation from the associates, did they know the associates, or are they just worried about the associates in general?

A: No.

(Emphasis added.)

Defense counsel argued that the prosecution had not provided enough specific information about the threats to justify the protective order. Counsel for Jovon compared the record to *Coleman v. State*, 321 Md. 586, 583 A.2d 1044 (1991), in which the motion court "knew what the specific statements by various people at various times" were and then narrowly tailored the protective order to prevent only disclosure of identity and contact information, not the substance of the witnesses' statements. He complained that there was insufficient information "for the court to make a rational, balanced, determination in exercising [its] discretion." In counsel's view, the generalized nature of the allegations means that "we don't know if it really was a threat. We just know that they perceived it as a threat. And I don't think that's . . . enough to grant that relief given the constitutional issues at point in this case."

The motion court ruled it was "satisfied that there is a significant issue with respect to the safety and welfare of these witnesses given the nature of the testimony, the nature of the allegations and the . . . reasonable fear with respect to their personal safety and prospect of retaliation by these two defendants or individuals on behalf of the defendants, in spite of the fact that they are locked up." The court granted the motion, distinguishing between victim witnesses and non-victim eyewitnesses, and ordering as follows:

- **Victim witnesses:** The State was required to give defense counsel the names of victim witnesses, but allowed to withhold current addresses, subject to the State making these witnesses available to defense counsel as set forth below.

- **Non-victim eyewitnesses:** The State was ordered to turn over to defense counsel, immediately following the hearing, the names, addresses, prior statements, charging documents and officer interview notes relating to this case, as well as the prior criminal records of these witnesses, and to make them available to defense counsel as

set forth below. But defense counsel was ordered not to disclose this protected information to either defendant before the trial date.

● **Witness availability:** The State was ordered to produce all witnesses before trial at its office for defense counsel to have a chance to meet with them, at least two weeks before trial. Each witness could decide whether he/she wanted to speak with defense counsel.

The motion court then addressed defense counsels' complaint that the order against discussing the substance of the witnesses' statements with their clients would interfere with their representation. Specifically, counsel argued:

[A]ny time someone takes a plea in a case there's always the question by the court, have you had enough time to talk to your lawyer about this case, have you discussed possible defenses, et cetera. So, I'm a little bit troubled ... that in order to discuss the case and have a theory of defense with a ... client that's going to trial, we need to say this is the evidence the State has produced against you. And it consists of a statement of a ... witness that says this about what you did. And this witness says he was ... in a position to say what he did. So, I'm bothered and feel extremely curtailed by my ability to effectively communicate with my client, theorize a defense in the case, and actually represent him effectively at trial, if I can't actually ... say look there's three witnesses that are going to slam dunk you.... They're going to say they did this....

The court agreed with the prosecutor that immediate disclosure of the identity and statements of all witnesses to defense counsel after the hearing would give counsel an opportunity to assess whether the protective order actually created any of these theoretical conflicts. The court assured defense counsel that it would reconsider its order if that occurred:

[T]hat full discovery is being given to you with the understanding that it's essentially not going to be disclosed to your clients. And **then after you review it, then you'll have an opportunity to discuss with [the prosecutor] any**

> agreement that can be reached that would allow you to
> further disclose that information.... If after your re-
> view of the discovery, there is information you feel
> would, that you would be able to discuss with your
> clients, that would not conflict with the protective order,
> and it would not cause a concern with respect to the
> safety to the individuals involved, then the protective
> order would be modified to allow you to disclose that.
> (Emphasis added.)

A written order followed stating, *inter alia*, that "if defense counsel desire further guidance from the Court or a reconsideration of this Order they may seek such relief from the Court."

### Trial

The Lancaster brothers were tried over three days. The only victim eyewitness to testify was C.J. Ford, who identified both Lancasters as participating in the home robbery on August 18–19. He testified that about two weeks after the robbery, he saw Pablo at a bus stop. Pablo approached him and "asked [him] about the police and his brother and [C.J.'s] brother[.]" C.J. told him, " 'I haven't talked to my brother,' " because C.J. "was mad at [Michael] about what happened[.]" He also told Pablo that he did not "know anything about . . . what was going on between . . . [Michael Ford] and his brother."

The State presented four witnesses whose identity and statements had been subjected to the protective order, all of whom had been arrested or charged with involvement in the robbery.

- Justin Navarro and Milton Doley accompanied the Lancasters during the robbery; both accepted plea deals that reduced their charges and sentences. During the robbery, Navarro carried a shotgun.

- Randall Gilmore saw the Lancasters with Hutson, Sukie, and three other men on the evening of the robbery, but he declined Pablo's invitation to accompany them in order to

"make a move." He was arrested in connection with the robbery, but charges were later dropped.

- Stephanie Hutson, who was dating Pablo at the time of the robbery, was at the Ford house just before the robbery, but left with Sukie. They went to a park and smoked marijuana, then were picked up after the robbery in a car occupied by Pablo, Jovon, Navarro, and Doley. While riding in the car, she heard the Lancasters and their accomplices say "how everybody in the house was scared and they just kind of punked out and followed what everybody said." They were "joking" about taking a CD player, cell phone, and credit cards. The charges against Hutson were nol prossed.

Two of these non-victim eyewitnesses testified about pre-trial contacts with the Lancasters while this case was pending. Doley saw Jovon while Doley was in jail on an unrelated burglary charge. Jovon asked him "if the police talked to [him] about what happened ... [t]he night in Olney." Doley told him he had not been approached, because police did not learn about his involvement until later.

Hutson testified that in August, before Pablo was arrested, she had "[a] few" conversations with him about the fact that Det. Mason was contacting her. Pablo "told [her] to say that [she] didn't know anything" and that she "better not say anything." After she, Pablo, and Jovon had been arrested, she saw the brothers again while they were waiting to appear for their preliminary hearings via video monitor. As she walked into the waiting room, Pablo was still in his holding cell, but he called "to get [her] attention just yelling AFALO-VA and [her] name." This was shorthand for "all for one love one for all[,]" which the Lancasters both used in "referring to people, their close friends, family." Pablo had the saying tattooed on his forearm. Jovon also yelled out her name and "AFALOVA."

Later, when Pablo was released from his holding cell, he "came over and sat in front of [Hutson] and started talking to [her]." She testified, "He was saying that I better not be

snitching. I hope you're not saying anything. That you got nothing to say. You better watch out." In response, Hutson asked an officer to move her to a different room. When she was leaving, Pablo said "[t]o say that [she did not] have anything to say. There was nothing to get them on."

## DISCUSSION

### *Coleman And Morgan:* The Limits Of Pre-trial Discovery

As a general rule, there is no constitutional right to pre-trial discovery in criminal cases, "and *Brady [v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] did not create one[.]" *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845–46, 51 L.Ed.2d 30 (1977); *see Goldsmith v. State*, 337 Md. 112, 121, 651 A.2d 866 (1995). The Court of Appeals, however, has mandated certain discovery in criminal cases, in order "to 'assist the defendant in preparing his defense and to protect him from surprise.' " *See Hutchins v. State*, 339 Md. 466, 473, 663 A.2d 1281 (1995) (citation omitted).

At issue in this appeal is Md. Rule 4–263(b)(1), which requires the State to disclose, upon defense counsel's request, "the name and address of each person then known whom the State intends to call as a witness at the hearing or trial to prove its case in chief or to rebut alibi testimony[.]" Exceptions are made for "[t]he identity of a confidential informant, so long as the failure to disclose the informant's identity does not infringe a constitutional right of the defendant and the State's Attorney does not intend to call the informant as a witness," and for "[a]ny other matter if the court finds that its disclosure would entail a substantial risk of harm to any person outweighing the interest in disclosure." *See* Md. Rule 4–263(c)(2)–(3). Thus, "[o]n motion and for good cause shown, the court may order that specified disclosures be restricted." Md. Rule 4–263(i).

The Court of Appeals has recognized that the State's disclosure obligations may be modified in order to protect the prosecution and its witnesses. In the seminal case of *Cole-*

*man v. State,* 321 Md. 586, 583 A.2d 1044 (1991), the Court recognized that it may be necessary to balance a defendant's discovery rights and his Sixth Amendment right to counsel against the State's interest in safeguarding witnesses and thereby preserving the integrity of the judicial process. The protective order in question prevented defense counsel from disclosing to their co-defendant clients, who were on trial for first degree murder, the identity of two key prosecution witnesses. As grounds for the order, detectives with substantial experience in homicide and drug investigations testified that the defendants were members of a drug-dealing gang that terrorized the neighborhood through fear and intimidation. According to the prosecution, Holt, a gang leader, ordered Givens, a gang "enforcer," to shoot the victim for stealing drugs from a gang stash, and Givens did so in broad daylight while the victim sat on the steps of a church. The State requested a protective order that the names of the State's key witnesses be withheld from the defendants until trial began, then offered detailed evidence in support of such an order.

First, the detectives described a community-wide fear of retaliatory violence that thwarts law enforcement efforts:

> The State tendered the showing of the required good cause through the testimony of two members of the Baltimore City Police Department–Detective Scott Keller of the Homicide Unit and Officer Thomas Marcucci of the Eastern Drug Enforcement Unit. . . .

> The picture painted by the two officers was appalling, all the more so because it reflected life on the street. . . . The residents of those neighborhoods. . . . are forced by fear and intimidation to accept an oppressive and onerous way of life. By reason of their fear and intimidation, the ability of law enforcement authorities to assist them is, to say the least, seriously hampered.

*Id.* at 592–93, 583 A.2d 1044.

The Court then reviewed the officers' testimony regarding the street drug war that precipitated the murder for which Coleman was on trial:

The area around the 800 block of Broadway is "a notorious place where drug deals are made." . . .

John (Skeeter) Holt apparently considered the area to be the exclusive territory of a drug organization he headed. The organization maintained "stash houses" in the area. Its cocaine was stored in these houses. The narcotics were packaged in clear vials. . . . distinguished by a pink cap. . . . Only the organization's cocaine was packaged with pink caps, and all the cocaine sold in the area by the organization had pink caps on the vials. This enabled the organization to control competition by assuring that only its drugs were being sold in the area.

Givens was a member of the organization. He played a dual role. He was a runner, one who sells drugs to users, and he was an enforcer, one who inflicts punishment on those who act contrary to the interests of the organization. He and Oswald (Pru) Trayham were responsible for "enforcing" in the organization. [The victim] McNeil became the subject of Givens' enforcement duties. The organization was aware that McNeil "would sit for hours many times and watch" where the organization put [its] stashes and then he would go steal the stash of drugs and sell it for his own profit, which angered the drug dealers.

The organization's cocaine was "pure," but McNeil would "cut" it before selling it. Thus, McNeil's activities not only diminished the organization's income, they also damaged the organization's reputation for the quality of its merchandise.

Coleman, one of the higher-ups in the organization, took steps to assuage the anger by terminating McNeil's activities and, at the same time, providing an example to others who might be so tempted. He directed Givens "to go and take care of" McNeil. He provided Givens with a weapon. Givens found McNeil sitting on the church steps. In broad daylight, he went up to McNeil and shot him three times.

*Id.* at 593–94, 583 A.2d 1044. The State also presented evidence of other crimes that Coleman's organization employed

to preserve its territory and to protect its interests. The murder of one Maurice Ireland was traced to Givens. Ireland, fresh out of jail, was owed money by Holt, apparently for some drug deal. He was "very pushy for his money [about $5000] to be paid back. . . ." At one point, "[h] e forcibly tried to get his money back . . . and as a result his murder was ordered." He was executed about a block from where McNeil was slain. Givens was charged with the murder of Ireland.

*Id.* at 594–95, 583 A.2d 1044.

The prosecution witnesses were aware of these reasons to fear testifying against Coleman:

The media-press, radio, and television-provide clear indication that the extreme sanction employed by the drug organization here is not unusual. A harkening of the news reports shows that unlawful drug organizations often use that means to preserve the territory they have adopted, to enforce what they consider to be their rights, and to protect their interests. The impact of this on enforcement functions, Keller explained, is that there is great difficulty in locating witnesses who will cooperate with authorities in drug related offenses.

[Witnesses] are very candid, usually that they don't want to be involved because they fear that they will be hurt in retribution for any information that they would give to us. They fear the people that are involved in the murder and they will not give us a statement, let alone come to court and testify.

The officer emphasized:

These cases are usually very, very difficult to make an arrest on, very difficult because there is a low level of cooperation in the community because of the fear in the community. They fear these people. These people rule the communities through intimidation and, you know, these are citizens that just-they don't want to be the next

one laying out there in this street with nobody coming forward to testify for them.

*See id.* at 595, 583 A.2d 1044.

Next, the Court of Appeals summarized the evidence of threats specific to that case:

The police did . . . receive information from the witnesses who were the subject of the protective order, one of whom was an eyewitness to the shooting. It was

specific information, and . . . a positive identification of Gregory Givens was made as the shooter of Delroy McNeil. Also, there was information given relative to a conversation . . . between Anthony Coleman and Gregory Givens just prior to the shooting of Delroy McNeil and also there was information as to actions of both individuals, what they did right before the shooting.

The witnesses agreed to testify in court, but not without reservations. Keller said: . . .

The biggest concern they had when I interviewed them was their personal safety. They are in extreme fear. They feel that if their identity is revealed that they would have to have 24 hour guard around the clock, but they feel like their life would not be worth a nickel. That's their words, extremely difficult to get people to come forward like this in these particular type cases and to give this kind of information and even more difficult, when you do get the information, for people to want to remain anonymous and not testify in court.

The officer observed that it is

[v]ery unusual for a person to put themselves this up front, so to speak, and be willing to go before the Baltimore City Grand Jury and come into a courtroom in front of whoever chooses to come in here and testify against an individual like this, an individual who is already indicted on two murders.

*Id.* at 595–96, 583 A.2d 1044.

The Court also considered the potential for retaliation by criminal associates of the defendants:

Keller pointed out that although Givens was in jail pending trial on Ireland's murder, Oswald (Pru) Trayham, the organization's other enforcer, was still on the street. Also police investigation indicated that Coleman was "sending emissaries from the Baltimore City Jail to issue harm to any of [the State's] witnesses." Questioned as to the basis of the witnesses' fear that they would be killed, Keller said:

Because of the prior activities of this drug organization. People that have been shot and people that have been shot and killed. There are also people that have just been shot and have not died because they have crossed this particular drug organization and their death was ordered.

He explained:

Now, in some particular instances the murder wasn't complete. The person didn't die because the hospital saved them. They believe that if their identity is made known to this drug organization they are not safe wherever they may be, whether it be under our protection.

The court remarked that this would be true even after they testified and the case was over. Keller responded:

Yes, it would be true. That's true. Correct. To be quite candid, Your Honor they are hoping that once the case is over the persons being tried will be incarcerated and then we would provide [the witnesses] with a means of leaving this area.

The judge inquired if the police would provide the witnesses with new identities. The officer replied the police did not have that capability, but, combined with the State's Attorney they would "do everything we can to help them leave the area."

*Id.* at 596–97, 583 A.2d 1044.

The motion court in *Coleman* "determined that the officers' testimony was credible" and "that the fears for the safety of the witnesses were well warranted," because their lives " 'may be endangered' " by their cooperation and testimony in this case. *See id.* at 597, 583 A.2d 1044. Concerned about " 'ham-

pering the defense in any way in the preparation of their case,'" however, the court required the State to provide defense counsel with the name of prosecution witnesses two weeks before trial, and to arrange for defense counsel to "question the witnesses out of the presence of the State's Attorney" *See id.* The court explicitly prohibited defense counsel from disclosing the identity of these witnesses to anyone, including the defendants, but conditioned that order with the proviso that it would " 'consider at any time prior to trial any reasonable request that is made for time to pursue follow-up to any information that is obtained as a result of the interview.' " *Id.* at 597–98, 583 A.2d 1044. Finally, the court

> emphasized, "I am open at any time to considering reasonable requests from the defense for more time, more access or any other reasonable request." She pointed out: ["]I am still in control of this particular Order so that I can certainly modify it in the way that I have indicated to you that I would.["]

*Id.* at 598, 583 A.2d 1044. The court's written order confirmed its bench ruling.

When the case was called for trial, counsel for co-defendants Coleman and Givens immediately challenged the fairness of the proceeding on grounds that the protective order denied their clients' rights to confrontation, due process, and fundamental fairness.

> The rationale of those claims ... was that "the State's whole case is going to rise and fall on the two witnesses who are being protected by this protective order." Not until the trial had commenced would the defendants be apprised of the identity of the witnesses so that defense counsel could ask the defendants "what do you know about this person, what dealings do you have with this person, who else knows about these dealings with this person, where can I find these other people who may or may not know about these things."

*Id.* at 600, 583 A.2d 1044.

The trial court acknowledged the dilemma in not being able to discuss " 'the most important part of the State's case ...

with your client, get any input from your client to see if your client may have information that could lead you to other information that may be helpful in your defense.' " *Id.* Nevertheless, the trial court denied the motion to dismiss, but instructed that,

> "after the cat is out of the bag or, in other words, after the witnesses have testified, if counsel for the defendants, as officers of the Court, find that there is a need for a day or two to track down additional witnesses, or to do further investigation to determine any possible motive or bias on behalf of these witnesses, the State's witnesses, then I will certainly permit that under the circumstances of this case."

*Id.* at 600–01, 583 A.2d 1044.

The Court of Appeals affirmed the convictions, ruling that the motion court did not abuse its discretion in issuing the protective order. *See id.* at 611, 583 A.2d 1044. The Court found the following rationale from *Brooks v. State,* 320 Md. 516, 578 A.2d 783 (1990), a case recognizing the need to protect the identity of confidential informants, equally applicable to cases in which there is a need to protect civilian witnesses:

> The privilege of the State to withhold certain matters from defendants in criminal causes has long been recognized, not only in Maryland but throughout the country. The privilege is especially important in the enforcement of narcotic laws, since it is most difficult to obtain evidence for prosecutions; there are rarely complaining witnesses. The manifest importance of the State in non-disclosure is "necessarily circumscribed by the defendant's interest in a fair trial." The privilege of non-disclosure must ordinarily give way where disclosure is essential to a fair determination of a cause. Trial judges are required "to balance the public interest in protecting the flow of information against the individual's right to prepare a defense."

> "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each

case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." "[T]he balancing test should be applied in all cases."

[T]he key element is ... the materiality of [the witness's] testimony to the determination of the accused's guilt or innocence balanced against the State's interest in protecting the identity of the [witness]. "The decision to compel disclosure ... is within the sound discretion of the trial court."

*Coleman,* 321 Md. at 602–03, 583 A.2d 1044 (quoting *Brooks,* 320 Md. at 523, 578 A.2d 783).

After conducting its own "independent constitutional appraisal of the confrontation and due process claims," the *Coleman* Court concluded that there was "no constitutional violation in the circumstances" and no "fundamental unfairness." *See id.* at 604, 583 A.2d 1044. The Court held there was sufficient evidentiary grounds for the motion court to conclude that "the life of any State witness was in danger once the witness was identified" and that the court "applied the proper test to the evidence, balancing the interest of the State and the interest of the defendants[.]" *Id.* at 603, 583 A.2d 1044. One aspect of the motion court's exercise of discretion that the Court explicitly approved was the order permitting defense counsel to obtain names, addresses, and audiences with the protected witnesses, outside the presence of prosecutors, two weeks before trial. *See id.*

Federal courts have approved protective orders designed to protect witnesses and prevent intimidation, against Sixth Amendment and due process challenges. In *Morgan v. Bennett,* 204 F.3d 360 (2d Cir.), *cert. denied,* 531 U.S. 819, 121 S.Ct. 59, 148 L.Ed.2d 26 (2000), for example, the Second Circuit rejected an ineffective assistance of counsel claim premised on the argument that a mid-trial protective order preventing defense counsel from disclosing to the defendant that a key prosecution eyewitness would testify at trial the next day violated the defendant's right to counsel. As trial

began, Hill, whom Morgan shot at the same time he murdered her roommate, was wavering in her decision to testify, due to fear of retaliation by Morgan and his associates. According to Hill, Morgan's associates visited her family members and directly warned her after she testified at a suppression hearing that they could guarantee her safety and that of her daughter only if she did not testify. Morgan himself spoke to Hill during trial, telling her on one occasion that she " 'look[ed] good' " and asking her whether she was " 'with me or what?' " After she balked at testifying, Morgan blew her a kiss and called out " 'I love you too. You don't have to worry about nothing. You took good care of it.' " *See id.* at 362–63.

The Second Circuit affirmed the denial of Morgan's *habeas* petition, which sought relief on the ground, *inter alia*, that he was deprived of unrestricted access to his attorney as a result of the protective order. *See id.* at 365. In doing so, the federal court recognized that courts "may not properly restrict the [defense] attorney's ability to advise the defendant unless the defendant's right to receive such advice is outweighed by some other important interest." *Id.* The government has such a strong interest when it seeks to prevent witness intimidation, which raises "concerns for both the well-being of the witness and her family and the integrity of the judicial process." *Id.* at 367.

> Such safety concerns have been held to justify a number of other types of intrusions on a defendant's normal access to information. For example, the court may properly allow the government to withhold the identity of persons who have furnished information of criminal activities to law enforcement officials where there is a legitimate concern for the safety of the informant. Or, on a similar showing of concern for a witness's safety, the witness's address, generally an appropriate subject of defense inquiry, may properly be withheld....
>
> Nor is the interest in the integrity of the judicial process so easily protected when the danger is that the defendant will so intimidate the witness that she either decides to give testimony that is false, incomplete, or misleading, or refuses

to testify at all. If the defendant's intimidation causes the witness to give false or misleading testimony, cross-examination may or may not bring out the truth. But in either event the record will contain false evidence whose effect may be to produce an unjust decision.

If the defendant's intimidation causes the witness not to testify, the loss of her testimony may, to a degree, be offset by the introduction of the witness's prior grand jury testimony, or hearsay evidence from a law enforcement officer or a prosecutor as to the witness's prior unsworn statements. However, the admission of such prior statements may well be an inadequate substitute for the witness's live testimony, and we consider it well within the proper bounds of the trial court's discretion to attempt instead to forestall the witness intimidation. . . .

We conclude that valid concerns for the safety of witnesses and their families and for the integrity of the judicial process may justify a limited restriction on a defendant's access to information known to his attorney.

*Id.* at 367–68 (citation omitted).

### Lancaster's Challenge

Lancaster argues that the "vague and conclusory allegations by the investigating detective that some witnesses had a concern about being involved in the case" did not rise to the level of specific threat that warranted the protective orders in either *Coleman* or *Morgan*. He asserts that the motion court "abused its discretion ... because the evidence the State presented at the protective order hearing failed to establish the existence of a substantial risk of harm to any of its witnesses." In particular, he complains, the "State did not produce any evidence of specific details of a perceived threat, how many and which witnesses expressed a fear of getting involved, what formed the basis for any of the witnesses' fears, or any of the witnesses' importance to the State's case." Thus, the protective order created a "structural defect" in the trial, denying him his Sixth Amendment right to counsel by preventing him from making informed decisions about trial

strategies, whether to go to trial or accept a plea, or whether to move to sever his trial from that of his co-defendant brother.

The State counters that Lancaster waived his challenge to the protective order, by agreeing to the course of action proposed by the motion court and making no further objection to the order after the hearing, either before or during trial. In any event, the State argues, the motion court did not abuse its discretion because defense counsel received the names and statements of the protected witnesses on the day of the protective order hearing, nearly two months before trial; defense counsel had the opportunity to meet with all witnesses who chose to speak with them, and was free to investigate witnesses, as long as their identities and statements were not disclosed to the Lancasters before trial; and the motion court explicitly invited defense counsel to seek modification of the protective order if, after reviewing the statements of these witnesses, counsel believed it could be important to discuss the statement with his client.

### Waiver

We conclude that Lancaster did not waive his objection to the protective order by accepting the ruling at the motion hearing. The record shows that defense counsel vigorously opposed the protective order in writing and at the hearing, on grounds renewed in this appeal.

We reach a different conclusion, however, with regard to Lancaster's failure to complain about the protective order after the State disclosed all the protected information to defense counsel, including the names and current addresses of witnesses, along with their statements, criminal records, and police interview notes. The motion court acknowledged the possibility that, after reviewing such information, defense counsel might find a need to discuss an aspect of the protected information with his client before the trial, in order to determine plea and trial strategy. Lancaster reads the court's order, however, as limiting the "the type of clarification and modification it would consider ... to circumstances in which

witness statements and identities could be shared with Lancaster 'without him being able to determine the witness' identification.' " After reviewing the bench ruling and written order in context, we conclude that Lancaster construes it too narrowly. The motion court explicitly invited defense counsel to seek reconsideration and/or clarification of the protective order in the event counsel developed a specific concern following disclosure of the protected information to counsel.

Defense counsel had the protected information for nearly two months before trial, but did not seek modification or clarification of the protective order as it pertained to any of the disclosed information. *Cf. United States v. Padilla,* 203 F.3d 156 (2d Cir.)(protective order temporarily barring counsel from informing clients about investigation into allegations of witness and jury tampering was lifted when it became relevant to their witness-selection decisions and to the nature of the anticipated cross-examination if defendants were to testify), *cert. denied,* 531 U.S. 832, 121 S.Ct. 86, 148 L.Ed.2d 47 (2000). There is nothing in the record to suggest that counsel approached the prosecutor in this regard, either, despite the court's suggestion of that alternative possibility. In these circumstances, we think that the failure to request relief from the protective order severely undermines Lancaster's complaint about it. *See, e.g., Coleman,* 321 Md. at 604, 583 A.2d 1044 (appellate court's decision that protective order delaying disclosure of prosecution witness information until trial did not violate defendant's constitutional rights was "bolstered by the fact that" defendant did not request time for additional investigation even though the court assured counsel that additional time would be granted if the defense found that "to be advisable as a result of the testimony of [protected] witnesses at trial"). We need not decide whether such silence, by itself, bars Lancaster's complaint, because we conclude that there was no abuse of discretion and no violation of constitutional rights in the circumstances presented here.

### Abuse Of Discretion

As the *Coleman* Court instructed, in determining whether the motion court abused its discretion by granting the

protective order, we focus first on the nature of the crime charged and the significance of witnesses sheltered by the protective order. Here, the crime was an armed robbery "by posse," committed at the home of one of the victim witnesses whose address was withheld from the Lancasters until trial. The record shows that the Lancasters enlisted their associates in planning and executing this robbery, as "payback" for Michael Ford's use of counterfeit money to purchase ecstasy from Jovon's girlfriend, who lived across the street from the Fords. In their efforts to "squeeze" Michael Ford and Jason Friday before the robbery, the Lancasters repeatedly visited and called their homes, at times involving innocent family members. Ultimately, the Lancasters came to the Ford home with handguns, a shotgun, and two masked associates, then accosted Ford's two brothers in the front yard, and took them inside, where they restrained them while stealing valuables from the family home.

Doley and Navarro, two of the protected co-conspirator witnesses, testified about the Lancasters' leadership roles in the crime. Stephanie Hutson, another protected witness, testified about the drug-related debt and "collection efforts" leading up to the robbery, and corroborated Doley's and Navarro's accounts of what was stolen. Clearly, these three protected witnesses were critical to the State's case.

 We acknowledge that the record here is less specific as to the nature of the threats against the protected witnesses than the compelling records that warranted the protective orders in *Coleman* and *Morgan*. Yet we do not read either case as requiring actual physical injury or refusal to testify as a prerequisite for a protective order. Rather, these cases teach that a witness protection order may be justified by proof of intimidation that significantly interferes with the State's ability to prosecute the case. In other words, a court does not abuse its discretion by imposing a protective order that delays disclosure of witness information to the defendants (but not defense counsel) when protected witnesses have a reasonable fear that the defendants or their associates will coerce the

witnesses not to testify against them, by threatening harm to the witnesses or their loved ones.

Here, we find sufficient evidentiary grounds for the motion court's conclusion that there was enough risk of the protected witnesses being intimidated that nondisclosure of their identities, whereabouts, and statements to the Lancasters was warranted until trial began. According to Det. Mason, an unidentified female witness feared for her safety and that of her young daughter as a result of conversations that associates of the Lancasters had with her and her family members, in which the associates asked about the child's welfare. Moreover, Det. Mason testified specifically that a protected witness reported that one of the Lancasters made direct oral threats concerning the witness's cooperation with the State in this case. Given Stephanie Hutson's trial testimony, it appears that she was the witness to whom Det. Mason referred. She testified that, when they saw her as she was waiting to appear for court, both Pablo and Jovon called out reminders of their "all for one, love one for all" code of solidarity, and then Pablo followed up by specifically warning Hutson she "better not tell them anything." As recounted by Det. Mason, and corroborated by Hutson at trial, once police began questioning her, Pablo Lancaster repeatedly warned his former girlfriend not to "snitch" and to "watch out."

Det. Mason also testified generally that several of the 10 witnesses he had interviewed expressed fear of retaliation by the defendants, specifically that the Lancasters or their associates would "come get them at their home." Such fears are consistent with the crime charged here, in which the Lancasters retaliated against Michael Ford and Jason Friday by repeatedly "com[ing] to get them at their home[s]," as well as the fact that the Lancasters used violence and weapons both in this crime and in unrelated crimes that included armed robbery and carjacking. It is also consistent with the evidence that the Lancasters enlisted associates in planning and executing this robbery, and that protected witnesses were aware of other associates of the Lancasters who are "capable of" similar acts of violence and retaliation. Finally, the exis-

tence of such fears is further demonstrated by the fact that some of the protected witnesses moved following the Lancasters' arrests. Although Det. Mason did not say that these moves were made specifically to hide from the Lancasters and their associates, the court could infer from his testimony that these witnesses did not want the Lancasters to know their current addresses.

A third factor weighing in favor of the protective order was its tailored scope. As in *Coleman*, this order allowed defense counsel to obtain the protected information, to interview prosecution witnesses in a safe setting at least two weeks before trial, and to seek modification of the prohibition against disclosure to his client if counsel believed such disclosure could be important to his representation. Lancaster mischaracterizes this protective order as significantly broader than the one approved in *Coleman*, because it covered witness statements as well as names and addresses of witnesses. We do not agree that the inclusion of witness statements materially distinguishes this case from *Coleman*.

■ First, Md. Rule 4–263(b) does not require the State to supply the defendant with the substance of testimony to be given by its witnesses, or otherwise to furnish copies of written statements (or law enforcement notes regarding oral statements) made by such witnesses. *See Carr v. State*, 284 Md. 455, 471, 397 A.2d 606 (1979).[2] Second, Lancaster does not complain that one or more of the witness statements that were not disclosed to him until trial contained specific information that might have altered his trial preparation or strategy if defense counsel had been able to discuss it with him before trial.

Furthermore, Lancaster has not identified any specific matter for which pre-trial disclosure of the protected information to him—as opposed to defense counsel—might have affected

---

**2.** Although Md. Rule 4–263(a)(2) also requires disclosure of any "pre-trial identification of the defendant by a witness for the State," Lancaster has not complained that such information was withheld pursuant to the challenged protective order.

his plea negotiations, trial preparation, or trial strategy. Although Jovon complains that he might have pursued severance of his case from his brother if he had known that Hutson was alleging that Pablo explicitly threatened her,[3] we see nothing in the record to indicate that such information would have been available and material to Lancaster absent the protective order. If the protected documents did not contain information about Hutson's claim that Pablo intimidated her, then the order for defense counsel not to discuss the protected information could not have affected Lancaster's decision not to seek severance. Alternatively, if Lancaster's attorney learned about Pablo's threat before trial, either via the disclosed materials or during defense counsel's interview with Hutson at the State's Attorney's office, then counsel had the information necessary to consider whether severance was advisable, and to seek any relief from the protective order that may be necessary to pursue that option. As discussed above, counsel's failure to do so prevented the court from addressing or remedying any such complaint. *See* Md. Rule 4–232(c); Md. Rule 8–131(a).

### Structural Error

Finally, we are not persuaded that this protective order created a structural defect.[4] "A structural defect or

---

3. Jovon suggests that severance may have been warranted because Hutson's testimony that she was intimidated by Pablo's warning that she "better not be snitching" could not have been admitted against him if he had been tried separately. Given the evidence that the Lancasters operated as a team throughout the events relevant to this case, however, we could not say it would be error or abuse of discretion to treat Pablo's threats as having been made in furtherance of Jovon's interests as well as his own. Thus, Pablo's threats might have been admissible against Jovon. In any event, for the same reason, we cannot say it was an abuse of discretion for the court to consider Pablo's threats to Hutson as reason to impose disclosure restrictions against both Lancasters.

4. "As in the presumed prejudice cases, the Supreme Court has found an error to be structural and subject to automatic reversal in a very limited number of cases[,]" in which error is "of constitutional magnitude." *Redman v. State*, 363 Md. 298, 304 n. 5, 768 A.2d 656, *cert. denied*, 534

error is one that 'affect[s] the framework within which the trial proceeds', rather than simply an error in the trial process itself[,] .... [and] 'transcends the criminal process.' " *Alston v. State*, 177 Md.App. 1, 13, 934 A.2d 949 (2007)(quoting *Arizona v. Fulminante*, 499 U.S. 279, 310–11, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)), *cert. granted*, 403 Md. 304, 941 A.2d 1104 (2008). Structural errors or defects in a criminal trial are not subject to harmless error review. *See id.* That is because

> [e]ach of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair."

*Fulminante*, 499 U.S. at 312, 111 S.Ct. at 1266, 111 S.Ct. 1246 (citation omitted).

■■■ Lancaster has not cited a case holding that a protective order prohibiting pre-trial disclosure of witness identity, address, or statements created such structural error by violating a criminal defendant's Sixth Amendment right to counsel.[5]

---

U.S. 860, 122 S.Ct. 140, 151 L.Ed.2d 92 (2001). "Such defects include a defective reasonable doubt instruction, racial discrimination in grand jury selection, denial of a public trial, total deprivation of counsel, and a judge who is not impartial." *Id.; see Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). "The types of trial error that the Supreme Court has held **not** to be structural include the admission of an involuntary confession, a defendant's statements obtained in violation of the Sixth Amendment or the Fourteenth Amendment, and an out-of-court statement by a non-testifying co-defendant." *Alston v. State*, 177 Md.App. 1, 13, 934 A.2d 949 (2007), *cert. granted*, 403 Md. 304, 941 A.2d 1104 (2008); *see Fulminante*, 499 U.S. at 309–311, 111 S.Ct. at 1265.

5. The cases Lancaster relies on are inapposite, because they involve deprivation of the right to counsel during trial and arise from concerns about improper coaching of the defendant during a recess in his testimony. *See Geders v. United States*, 425 U.S. 80, 82–84, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (order prohibited consultation between defendant and counsel during overnight trial recess); *United States v.*

In upholding comparable protective orders, other federal and state courts have considered whether the challenged order prejudiced the defendant, demonstrating that these courts do not treat such allegations of error as involving a structural defect. *See, e.g., Morgan*, 204 F.3d at 367–68 (protective order preventing defense counsel from disclosing to the defendant that the key prosecution eyewitness would testify at trial the next day did not violate Sixth Amendment right to counsel); *Howard v. United States*, 656 A.2d 1106, 1111–12 (D.C. 1995) (protective order preventing defense counsel from disclosing to defendant that he was under investigation for an unrelated crime did not violate right to counsel); *People v. Mojica*, 244 A.D.2d 138, 677 N.Y.S.2d 100, 105 (1998)(protective order preventing defense counsel from disclosing to defendant identity of expected prosecution witnesses did not violate right to counsel), *appeal denied*, 92 N.Y.2d 950, 681 N.Y.S.2d 481, 704 N.E.2d 234 (1998). We agree with this approach. This is not a case in which the defendant was denied access to counsel. As *Coleman* illustrates, restrictions against pre-trial disclosure of witness information may be appropriate even when they affect defense preparation and strategy, and even when challenged against constitutional guarantees of confrontation, due process, and fairness. *See Coleman*, 321 Md. at 604, 583 A.2d 1044. Moreover, as both the *Coleman* Court and the motion court here recognized, the alleged harm in this situation might be avoided or cured by a timely request for relief from the protective order with respect to information that defense counsel deems critical to discuss with his client before trial.

## Conclusion

Finding no error or constitutional violation, we shall affirm the convictions.

---

*Allen*, 542 F.2d 630, 632, 634 (4th Cir.1976)(trial court's orders prohibiting counsel from talking to defendant overnight or during brief recess violated Sixth Amendment), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1179, 51 L.Ed.2d 584 (1977); *Clark v. State*, 306 Md. 483, 490–92, 510 A.2d 243 (1986)(order restricting attorneys for co-defendants from consulting during peremptory strikes denied effective assistance of counsel).

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.