978 A.2d 717

**Jovon Brian LANCASTER**

v.

**STATE of Maryland.**

**No. 74, Sept. Term, 2008.**

Court of Appeals of Maryland.

Aug. 27, 2009.

Benjamin Miller, Assigned Public Defender, Washington, DC, for petitioner.

Jessica V. Carter, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Steven L. Holcomb, Asst. Atty. Gen., Baltimore), on brief, for respondent.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), and RAYMOND G. THIEME, JR., (Retired, Specially Assigned), JJ.

RAYMOND G. THIEME, JR., J., Retired Specially Assigned.

In this opinion, we revisit the increasing problems posed by cases of gang-related intimidation of witnesses, which cannot be overstated. After a jury trial in the Circuit Court for Montgomery County, petitioner, Jovon Brian Lancaster ("Lancaster"), was convicted of two counts of robbery with a dangerous weapon, two counts of second degree assault, one count of first degree burglary, and one count of conspiracy to commit robbery with a dangerous weapon. Affirming Lancaster's convictions, the intermediate appellate court held that the circuit court (to which we shall also refer as the "motion court") did not abuse its discretion by granting "a pre-trial protective order that required [Lancaster's] defense counsel to delay disclosing to him[,] until the day of trial[,] the names, addresses, and statements of certain prosecution witnesses." *Lancaster v. State*, 180 Md.App. 1, 4, 948 A.2d 102, 104 (2008).

Lancaster presents to us three questions, which we have reduced to one and rephrased for clarity: [1] Did the intermediate appellate court err in holding that the circuit court did not abuse its discretion in issuing the protective order? We shall hold that the intermediate appellate court erred, and hence, we shall reverse Lancaster's convictions and remand his case to the circuit court for further proceedings consistent with this opinion.

---

1.  Lancaster's questions presented *verbatim* are:

    1) Did the Court of Special Appeals ignore established law by ruling that, even though trial counsel properly objected when the motion court issued a protective order, counsel needed to object again to preserve the issue for appeal?

    2) Did the motion court abuse its discretion in issuing the broad protective order that kept key witness information from Mr. Lancaster prior to trial when the State failed to provide the court with any information about the importance of these witnesses or sufficient evidence to establish that full disclosure of witness information presented a substantial risk of harm to any potential witness?

    3) Did the protective order, that was incorrectly issued by the motion court, improperly restrict trial counsel's ability to communicate and provide information to Mr. Lancaster for an extended period of time, denying him his constitutional right to counsel?

## FACTS AND PROCEEDINGS

We quote the intermediate appellate court's excellent recitation of the pertinent facts:

### The Crimes

At trial, the State presented evidence that ... Lancaster and his codefendant brother, Pablo Guillermo Lancaster [ ("Pablo") ], were involved in a series of drug-related incidents that culminated in a home robbery. On July 13, 2005, Michael Ford and Jason Friday used a counterfeit $100 bill to buy ecstasy pills from "Sukie," ... Lancaster's girlfriend, who lived across the street from Ford's house at 17909 Shotley Bridge Place in Olney. The next morning, July 14, Sukie called Friday to complain about the counterfeit money. When Friday rebuffed her, she told him that two drug dealers were coming to his house.

A couple of hours after Sukie's call, two men, whom Friday later identified as [Lancaster] and Pablo ..., visited Friday's home. Friday's father escorted them into the home. The pair demanded money for the prior night's transaction, and asked Friday to "step outside" when his father "kept asking what was going on." Friday went to the porch, and promised them that he would give them the money when he had it. The pair left, but came back to get Friday's phone numbers. Once inside, one of them picked up Friday's cell phone from the table and left with it.

Michael Ford also received a call from Sukie on the morning of July 14. She was "angry, upset and confused." Ford exchanged calls with Friday, telling his friend that he was not going to give him any money, at which point the call terminated abruptly. Shortly thereafter, Ford received another call from Friday's cell phone. When Ford answered, an unknown male said, "You got our money." In a second call, the same man said he was on his way to Ford's house. Minutes later, the same caller informed Ford, "I'm outside."

Ford enlisted his brother C.J.'s help, and together they walked out to the car parked on the street in front of their

house. Two men identified as the Lancasters sat in the car. They told him that Friday gave them fake money and that Friday sent them to him. During the encounter, Michael Ford called Friday's cell, which rang in the possession of the man in the back seat, who identified himself as "Juvenile."

Over the next several days, Ford received at least five calls from the same man demanding repayment and/or asking where to find Friday. On July 18, Ford received three calls from the same caller, again demanding payment. On the third call, the caller said, "I'm on my way to your house."

Presently, a group of men, some wearing masks and carrying firearms, came to the Ford home. The Lancaster brothers were part of this group; neither was masked and both carried handguns. Neither Michael Ford nor his mother Rosetta Ford were home at the time. Michael's brother C.J. and Deandre were outside. The men patted them down, brandished a shotgun, then directed them inside, where the Lancasters took their wallets, cell phones, and money. The robbers seated both brothers on a couch with an unidentified woman, where they remained while the robbers went through the house, taking two stereos, jewelry, and clothes.

Upon returning home after her night shift, Rosetta Ford learned what happened and reported the incident to police. On August 26, 2005, Pablo and . . . Lancaster were arrested for robbery and related crimes.

### Hearing on Protective Order

On December 15, 2005, the State moved for a protective order, seeking to withhold from the Lancasters and their counsel the current location of victim witnesses, and to prevent defense counsel from sharing with their clients before trial the names, criminal records, prior statements[,] and grand jury testimony of certain non-victim civilian witnesses (the "protected witnesses"). Defense counsel filed written opposition to the motion.

At a January 12, 2006 hearing on the motion, the State explained that it was seeking protective orders with respect to three different categories of witnesses: (1) victims; (2) non-victim eyewitnesses, *i.e.*, persons who participated in the crime with the Lancasters; and (3) other fact witnesses who were neither victims nor eyewitnesses, *i.e.*, persons who had information that tied the Lancasters to the armed robbery but were not present while it was committed.

The State presented the testimony of Det[ective] Eric A. Mason, the "primary investigator," as grounds for the protective order. [Det.] Mason had been assigned to the robbery section of the Montgomery County Police Department's major crimes unit for one year; he had 24 years experience in the Department before that.. On direct examination, [Det.] Mason testified that some witnesses feared retaliation by the Lancasters:

[Prosecutor]: How many witnesses would you say you've interviewed in the course of your investigation of this crime?

[Det. Mason]: Numerous, I would probably say, ballpark of maybe ten.

Q: Okay, and of those witnesses have any of them expressed any concerns regarding their involvement in the case, talking to you, et cetera?

A: Yes, sir.

Q: Okay. What kind of concerns on a generalized fashion [have] those witnesses articulated to you?

A: **Fear that retaliation will be made against them. Fear that they would come to their homes.... That they knew where they lived at....**

Q: And is the fear specific to the two defendants or is it to go to known associates of the defendants as well?

A: The defendants and their associates.

Q: Okay. And **within these ten witnesses is there a smaller group of those witnesses who expressed particularized fears because of specific threats they've perceived from these defendants?**

A:   **Yes.** (Emphasis added.)

When counsel for both Lancasters expressed concern about their ability to cross-examine the protected witnesses regarding the allegation of specific threats, the prosecutor assured court and counsel that full disclosure of the identities, prior statements, and criminal records of all witnesses, including the protected witnesses, would be made to defense counsel as soon as the hearing concluded.

The State then proceeded with its direct examination of Det. Mason regarding the protected witnesses:

[Prosecutor]: This subset of witnesses . . . have they told you about specific threats they've perceived from the defendants?

[Det. Mason]: Yes.

Q:   Okay. And **has this subset of witnesses perceived those threats to be in relation to their potential participation in this matter, and your investigation?**

A:   **Yes.**

Q: . . . . The crime charged, . . . . allegation involves a home invasion, correct?

A:   Yes, sir.

Q:   And does it involve people in addition to the two defendants here?

A:   Yes.

Q:   Okay. It involves, in fact, five or six people, correct?

A:   Yes.

Q:   And is there an allegation that firearms were involved in that home invasion[?]

A:   Yes.

Q:   Okay. And are you aware of other violent conduct by the two defendants that has been charged against them?

A:   Yes. . . .

Q:   Has that violent conduct involved firearms?

A:   Yes. . . .

Q: Do you know if that violent conduct that involved firearms has resulted in indictments against the two defendants?

A: Yes.

Q: Okay. And is it for a carjacking for both of them?

A: Yes.

Q: And armed robbery for both of them?

A: Yes, sir.

Q: Okay. And are you aware about the subset of witnesses that we're talking about, are they aware of that conduct by the defendants?

A: Yes.

Q: And **this subset of witnesses, ... have they made known to you their awareness of other violent conduct by the defendants?**

A: **Yes.** (Emphasis added.)

On cross-examination, defense counsel established that some of the protected witnesses have a criminal background and that Det. Mason interviewed each witness independently from the others. Counsel then unsuccessfully attempted to question [Det.] Mason about the specific nature of the alleged threats against prosecution witnesses. Counsel for Pablo ... asked the detective, "Can you give me a detail of what they perceived as a threat. What articulable fact they would have had, that they could have perceived as a threat?" The prosecutor objected, arguing that "the response to that question is going to further any attempt by the defendants to identify this witness." The court suggested that the question be rephrased, noting that "it is a fair concern that" information regarding "the substance of the threats" could "allow a determination as to ... the identity of those individuals." Defense counsel then continued:

[Counsel for Pablo]: This is rather ethereal here but let me ... try it this way.... [Y]ou were not personally present during any threats made to any of these subset of witnesses, correct?

[Det. Mason]: No.

Q: So, you would have heard that they perceived the threat, correct?

A: Yes.

Q: **Were any of them direct contact with either one of these two defendants?.... [D]id they say that, to you, it was made directly by one of these two gentlemen?**

A: **One of them, yes.**

Q: And . . . . which one of the defendants . . . ?

[Prosecutor]: And I'm objecting. . . . I think we've established a very fine perimeter around what this threat is specific threat [sic], the witness perceived it, and perceived it from one of the defendants. I think any question beyond that is going . . . too close to the identification of who these witnesses are.

The [c]ourt: All right, I'll sustain the objection.

[Counsel for Pablo]: **Can you tell me a little bit more about the nature of the threat, verbal, look, glance, shrugged shoulders, pointing fingers, telephone call, letter, what's the nature of the basis of their perceived threat?**

A: **Verbal.**

Q: Okay. And would the answer be the same if I asked you **what their perceived threat was from, what you call, associates of the defendants?**

A: Just prior history. . . . **It's just prior history of knowing of the group they hung with. What they are capable of doing.**

Q: Okay, so they're telling you I've been involved with these people in the past then basically, I guess, I'm afraid of them in the future, right?

A: Basically, yes, sir.

Q: Okay. Now[,] none of these people was hurt or harmed in any way up to the time you talked to them and you testified in court today.

A: Not that I know of.

Q: **Nobody had to move, at least these witnesses, or anything?**

A: It depends on what witnesses you're talking about. **Yes, some of them moved.** (Emphasis added.)

Next[,] counsel for ... Lancaster continued the cross-examination of Det. Mason. After establishing that [Det.] Mason was not aware of "any threats by the associates," defense counsel attempted to learn more about the threat allegedly made by one of the defendants. He asked when that threat was made, and whether any threat had been made while both defendants were incarcerated pending trial. The court sustained objections to both inquiries, despite defense counsel's insistence that this information "goes to their dangerousness." Cross-examination continued:

[Counsel for Lancaster]: When the home invasion allegedly occurred, the invaders said things to the victims, in the home, correct?

[Det. Mason]: Yes.

Q: ... **The threat, is it from an event other than that conversation?**

A: **Yes....**

Q: The people that said that they were concerned about threats from the associates, from retaliation from the associates, did they know the associates, or are they just worried about the associates in general?

A: No.

(Emphasis added.)

Defense counsel argued that the prosecution had not provided enough specific information about the threats to justify the protective order. Counsel for [Lancaster] compared the record to *Coleman v. State*, 321 Md. 586, 583 A.2d 1044 (1991), in which the motion court "knew what the specific statements by various people at various times" were and then narrowly tailored the protective order to prevent only disclosure of identity and contact information, not the

substance of the witnesses' statements. He complained that there was insufficient information "for the court to make a rational, balanced, determination in exercising [its] discretion." In counsel's view, the generalized nature of the allegations means that "we don't know if it really was a threat. We just know that they perceived it as a threat. And I don't think that's ... enough to grant that relief given the constitutional issues at point in this case."

The motion court ruled [that] it was "satisfied that there is a significant issue with respect to the safety and welfare of these witnesses given the nature of the testimony, the nature of the allegations and the ... reasonable fear with respect to their personal safety and prospect of retaliation by these two defendants or individuals on behalf of the defendants, in spite of the fact that they are locked up." The court granted the motion, distinguishing between victim witnesses and non-victim eyewitnesses, and ordering as follows:

- **Victim witnesses:** The State was required to give defense counsel the names of victim witnesses, but allowed to withhold current addresses, subject to the State making these witnesses available to defense counsel as set forth below.

- **Non-victim eyewitnesses:** The State was ordered to turn over to defense counsel, immediately following the hearing, the names, addresses, prior statements, charging documents[,] and officer interview notes relating to this case, as well as the prior criminal records of these witnesses, and to make them available to defense counsel as set forth below. But[,] defense counsel was ordered not to disclose this protected information to either defendant before the trial date.

- **Witness availability:** The State was ordered to produce all witnesses before trial at its office for defense counsel to have a chance to meet with them, at least two weeks before trial. Each witness could decide whether he/she wanted to speak with defense counsel.

The motion court then addressed defense counsels' complaint that the order against discussing the substance of the witnesses' statements with their clients would interfere with their representation. Specifically, counsel argued:

[A]ny time someone takes a plea in a case there's always the question by the court, have you had enough time to talk to your lawyer about this case, have you discussed possible defenses, et cetera. So, I'm a little bit troubled . . . that in order to discuss the case and have a theory of defense with a . . . client that's going to trial, we need to say [that] this is the evidence the State has produced against you. And it consists of a statement of a . . . witness that says this about what you did. And this witness says he was . . . in a position to say what he did. So, I'm bothered and feel extremely curtailed by my ability to effectively communicate with my client, theorize a defense in the case, and actually represent him effectively at trial, if I can't actually . . . say[,] look[,] there's three witnesses that are going to slam dunk you. . . . They're going to say they did this. . . .

The court agreed with the prosecutor that immediate disclosure of the identity and statements of all witnesses to defense counsel after the hearing would give counsel an opportunity to assess whether the protective order actually created any of these theoretical conflicts. The court assured defense counsel that it would reconsider its order if that occurred:

[T]hat full discovery is being given to you with the understanding that it's essentially not going to be disclosed to your clients. And **then after you review it, then you'll have an opportunity to discuss with [the prosecutor] any agreement that can be reached that would allow you to further disclose that information. . . . If after your review of the discovery, there is information you feel would, that you would be able to discuss with your clients, that would not conflict with the protective order, and it would not cause a concern with respect to the safety [of] the individuals involved,**

**then the protective order would be modified to allow
you to disclose that.** (Emphasis added.)

A written order followed stating, *inter alia,* that "if defense
counsel desire further guidance from the [c]ourt or a recon-
sideration of this Order[,] they may seek such relief from
the [c]ourt."

## Trial

The Lancaster brothers were tried over three days. The
only victim eyewitness to testify was C.J. Ford, who identi-
fied both Lancasters as participating in the home robbery
on August 18–19. He testified that about two weeks after
the robbery, he saw Pablo at a bus stop. Pablo approached
him and "asked [him] about the police and his brother and
[C.J.'s] brother[.]" C.J. told him, " 'I haven't talked to my
brother,' " because C.J. "was mad at [Michael] about what
happened[.]" He also told Pablo that he did not "know
anything about . . . what was going on between . . . [Michael
Ford] and his brother."

The State presented four witnesses whose identity and
statements had been subjected to the protective order, all of
whom had been arrested or charged with involvement in the
robbery.

- Justin Navarro and Milton Doley accompanied the Lan-
  casters during the robbery; both accepted plea deals
  that reduced their charges and sentences. During the
  robbery, Navarro carried a shotgun.

- Randall Gilmore saw the Lancasters with Hutson, Suk-
  ie, and three other men on the evening of the robbery,
  but he declined Pablo's invitation to accompany them in
  order to "make a move." He was arrested in connec-
  tion with the robbery, but charges were later dropped.

- Stephanie Hutson, who was dating Pablo at the time of
  the robbery, was at the Ford house just before the
  robbery, but left with Sukie. They went to a park and
  smoked marijuana, then were picked up after the rob-
  bery in a car occupied by Pablo, [Lancaster], Navarro,

and Doley. While riding in the car, she heard the Lancasters and their accomplices say "how everybody in the house was scared and they just kind of punked out and followed what everybody said." They were "joking" about taking a CD player, cell phone, and credit cards. The charges against Hutson were [*nolle prossed*].

Two of these non-victim eyewitnesses testified about pretrial contacts with the Lancasters while this case was pending. Doley saw [Lancaster] while Doley was in jail on an unrelated burglary charge. [Lancaster] asked him "if the police talked to [him] about what happened [on t]he night in Olney." Doley told him he had not been approached, because police did not learn about his involvement until later.

Hutson testified that in August, before Pablo was arrested, she had "[a] few" conversations with him about the fact that Det. Mason was contacting her. Pablo "told [her] to say that [she] didn't know anything" and that she "better not say anything." After she, Pablo, and [Lancaster] had been arrested, she saw the brothers again while they were waiting to appear for their preliminary hearings via video monitor. As she walked into the waiting room, Pablo was still in his holding cell, but he called "to get [her] attention just yelling AFALOVA and [her] name." This was shorthand for "all for one love one for all[,]" which the Lancasters both used in "referring to people, their close friends, family." Pablo had the saying tattooed on his forearm. [Lancaster] also yelled out her name and "AFALOVA."

Later, when Pablo was released from his holding cell, he "came over and sat in front of [Hutson] and started talking to [her]." She testified, "He was saying that I better not be snitching. I hope you're not saying anything. That you got nothing to say. You better watch out." In response, Hutson asked an officer to move her to a different room. When she was leaving, Pablo said "[t]o say that [she did not] have anything to say. There was nothing to get them on."

*Lancaster, supra,* 180 Md.App. at 5–16, 948 A.2d at 104–10 (footnote omitted).

## The Intermediate Appellate Court's Opinion

On appeal to the intermediate appellate court, Lancaster contended that

the "vague and conclusory allegations by the investigating detective that some witnesses had a concern about being involved in the case" did not rise to the level of specific threat that warranted [a] protective order[.] He assert[ed] that the motion court "abused its discretion ... because the evidence [that] the State presented at the protective order hearing failed to establish the existence of a substantial risk of harm to any of its witnesses." In particular, he complain[ed that] the "State did not produce any evidence of specific details of a perceived threat, how many and which witnesses expressed a fear of getting involved, what formed the basis for any of the witnesses' fears, or any of the witnesses' importance to the State's case." Thus, the protective order ... den[ied] him his Sixth Amendment right to counsel by preventing him from making informed decisions about trial strategies[.]

*Id.* at 26–27, 948 A.2d at 116.

The State countered that

the motion court did not abuse its discretion[,] because defense counsel received the names and statements of the protected witnesses on the day of the protective order hearing, nearly two months before trial; defense counsel had the opportunity to meet with all witnesses who chose to speak with them, and was free to investigate witnesses, as long as their identities and statements were not disclosed to the Lancasters before trial; and the motion court explicitly invited defense counsel to seek modification of the protective order if, after reviewing the statements of these witnesses, counsel believed it could be important to discuss the statement with his client.

*Id.* at 27, 948 A.2d at 117.

Affirming Lancaster's convictions, the intermediate appellate court held that "a court does not abuse its discretion by imposing a protective order that delays disclosure of witness

information to the defendants (but not defense counsel) when protected witnesses have a reasonable fear that the defendants or their associates will coerce the witnesses not to testify against them, by threatening harm to the witnesses or their loved ones[,]" and that "there was no abuse of discretion and no violation of constitutional rights in the circumstances presented here." *Id.* at 28–30, 948 A.2d at 118. "[A]cknowledg[ing] that the record here is less specific as to the nature of the threats against the protected witnesses than the compelling [record] that warranted the protective [order] in *Coleman[, supra,]*" the intermediate appellate court found "sufficient evidentiary grounds for the motion court's conclusion that there was enough risk of the protected witnesses being intimidated that nondisclosure of their identities, whereabouts, and statements to the Lancasters was warranted until trial began." *Id.* at 29–30, 948 A.2d at 118. The intermediate appellate court further concluded that, because "the alleged harm in this situation might [have been] avoided or cured by a timely request for relief from the protective order[,]" Lancaster "was [not] denied access to counsel." *Id.* at 34, 948 A.2d at 121.

## DISCUSSION

### The Parties' Contentions

Lancaster contends that "[t]he motion court abused its discretion when it granted the protective order[.]" Because "[t]he State did not produce any evidence of [any] witnesses' importance to its case, specific details of [any] perceived threat, how many and which witnesses expressed a fear of getting involved, or what formed the basis for any of the witnesses' fears[,]" he claims, "the State failed to establish the existence of a substantial risk of harm to any of its witnesses." *See* Rule 4–263(c)(3) (amended 2008),[2] *infra.* He further asserts that, because the "protective order interfered with the

---

2. In 2008, Rule 4–263 was extensively rewritten. Our references to Rule 4–263 are to the rule as it read at the time of Lancaster's protective order hearing.

ability of [defense] counsel to make independent decisions about how to conduct [Lancaster's] defense[,]" the motion court "denied [him] his constitutional right to the effective assistance of counsel." *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674, 692 (1984) ("Government violates the right to effective assistance [of counsel] when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." (citations omitted)). Finally, Lancaster maintains that the motion court's error "cannot be ruled harmless beyond a reasonable doubt." *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976) ("[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent view of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed ['harmless[.']").

The State counters that, "because the record establishes that [Lancaster's defense] counsel acquiesced to the [motion] court's ruling[,]" Lancaster's question is "not preserved for appellate review." *See Rocks v. Brosius*, 241 Md. 612, 630, 217 A.2d 531, 541 (1966) ("The right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal." (citations omitted)). Nevertheless, the State contends, the motion court "properly exercised discretion in granting the motion for a protective order[,]" because "the potential harm of disclosing [certain] information directly to Lancaster, as opposed only to his [counsel], was that victims and/or witnesses feared retaliation for their potential participation in this case from Lancaster ... and [his] associates." The State further claims that "Lancaster was not denied his right to counsel when the [motion] court granted the State's motion for a protective order[,]" and that "even if the [motion] court erred in granting a protective order, any error was harmless beyond a reasonable doubt." *See Dorsey, supra*, 276 Md. at 659, 350 A.2d at 678.

### Rule 4–263 and Pre–Trial Discovery

The *schwerpunkt*[3] in this appeal is Rule 4–263(b)(1), which, at the time of the protective order hearing, required the State, upon request of a defendant, to "[d]isclose to the defendant the name and address of each person then known whom the State intend[ed] to call as a witness at ... trial to prove its case in chief[.]" One of the exceptions to the Rule allowed the State to withhold certain discovery from a defendant "if the court [found] that its disclosure would entail a *substantial risk of harm* to any person outweighing the interest in disclosure." Rule 4–263(c)(3) (emphasis added). Accordingly, "[o]n motion and for good cause shown, the court [could] order that specified disclosures be restricted." Rule 4–263(i).

A prosecutor's acquisition of evidence from a broad variety of sources, and his or her ability to sift, evaluate, and test this information in private, coupled with a defendant's limited ability to uncover evidence advantageous to his case, recalls Justice Brennan's famous metaphor that the criminal process may be more like a "sporting event" than a quest for truth. *See* Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?, 1963 Wash.U.L.Q. 279. There is no better illustration of this "sport" than the prosecutor's treatment of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which, well-intentioned but utterly bedeviled in its details, spans the entire life of a criminal case, from birth at arraignment through pre-trial and trial, occasionally expiring in postconviction. After Brady was charged with premeditated murder, his counsel made a request to review the extrajudicial statements of his co-accused. *Id.* at 84, 83 S.Ct. at 1195, 10 L.Ed.2d at 217. One statement, in which the co-accused admitted to committing the homicide, was withheld by the prosecution. *Id.* The Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good

---

3. Principle thrust against opponent's perceived weak point.

faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court recognized the government's privilege to withhold certain evidence, particularly the identity of informants. *Id.* at 59, 77 S.Ct. at 627, 1 L.Ed.2d at 644. But, the Court qualified the privilege, stating that courts must "balanc[e] the public interest in protecting [this source] of information against the [defendant's] right to prepare [a] defense." *Id.* at 62, 77 S.Ct. at 628–29, 1 L.Ed.2d at 646. Courts balancing these interests must "tak[e] into consideration the crime charged, the possible defenses, the possible significance of the informant's testimony, and [any] other relevant factors." *Id.* at 62, 77 S.Ct. at 629, 1 L.Ed.2d at 646. *See also U.S. v. Wilson,* 77 F.3d 105, 111–12 (5th Cir.1996) (court did not abuse discretion by denying disclosure of informant identities where informants feared for their safety, defendant had a pending indictment for witness tampering, and defendant failed to produce evidence as to how informants' testimony might bear on his innocence or guilt, or make a substantial showing that informants' falsifications or misrepresentations were included in affidavits supporting applications for wiretaps). The Court further held that "[w]here the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro,* 353 U.S. at 60–61, 77 S.Ct. at 628, 1 L.Ed.2d at 645 (footnote omitted). Thus, the government must disclose an informant's identity where (1) the informant is a material witness or (2) the informant's testimony is crucial to the defense. *Id.*

### *Coleman*

We have recognized that the State's disclosure obligations may be modified in order to protect the prosecution and its witnesses. In the seminal case of *Coleman, supra,* we concluded that it may be necessary to balance a defendant's discovery rights and Sixth Amendment right to counsel

against the State's interest in safeguarding witnesses, thereby preserving the integrity of the judicial process. 321 Md. at 602–03, 583 A.2d at 1051–52. The protective order in question prevented defense counsel from disclosing to Anthony Coleman and Gregory Givens, co-defendants on trial for first degree murder, the identity of two key prosecution witnesses. *Id.* at 597–99, 583 A.2d at 1049–50. According to the prosecution, Coleman, one of the gang's "higher-ups," ordered Givens, the gang's "enforcer," to shoot the victim, Delroy McNeil, who was believed to have stolen drugs from the gang's "stash." *Id.* at 590, 594, 583 A.2d at 1046–47. Givens later shot McNeil in broad daylight as McNeil sat on the steps of a church. *Id.* at 594, 583 A.2d at 1047. The State requested a protective order that the names of the State's key witnesses be withheld from the defendants until trial began. *Id.* at 592, 583 A.2d at 1046.

In support of the order, officers with substantial experience in homicide and drug investigations testified that Coleman and Givens were members of a drug-dealing gang that terrorized a neighborhood through fear and intimidation. *Id.* at 592–97, 583 A.2d at 1046–49. First, the officers described a community-wide fear of retaliatory violence that thwarted law enforcement efforts:

> The picture painted by the . . . officers was appalling, all the more so because it reflected life on the street. . . . The residents of those neighborhoods . . . are forced by fear and intimidation to accept an oppressive and onerous way of life. By reason of their fear and intimidation, the ability of law enforcement authorities to assist them is, to say the least, seriously hampered.

*Id.* at 593, 583 A.2d at 1047.

The officers then testified regarding the street drug war that precipitated the murder for which Coleman was on trial:

> . . . The area around the 800 block of Broadway is
> a notorious place where drug deals are made. . . .
> John (Skeeter) Holt apparently considered the area to be the exclusive territory of a drug organization he headed.

The organization maintained "stash houses" in the area. Its cocaine was stored in these houses. The narcotics were packaged in clear vials ... distinguished by a pink cap.... Only the organization's cocaine was packaged with pink caps, and all the cocaine sold in the area by the organization had pink caps on the vials. This enabled the organization to control competition by assuring that only its drugs were being sold in the area.

Givens was a member of the organization. He played a dual role. He was a runner, one who sells drugs to users, and he was an enforcer, one who inflicts punishment on those who act contrary to the interests of the organization. He and Oswald (Pru) Trayham were responsible for "enforcing" in the organization. McNeil became the subject of Givens' enforcement duties. The organization was aware that McNeil "would sit for hours many times and watch" where the organization

> put [its] stashes and then he would go steal the stash of drugs and sell it for his own profit, which angered the drug dealers.

The organization's cocaine was "pure," but McNeil would "cut" it before selling it. Thus, McNeil's activities not only diminished the organization's income, they also damaged the organization's reputation for the quality of its merchandise.

Coleman, one of the higher-ups in the organization, took steps to assuage the anger by terminating McNeil's activities and, at the same time, providing an example to others who might be so tempted. He directed Givens "to go and take care of" McNeil. He provided Givens with a weapon. Givens found McNeil sitting on the church steps. In broad daylight, he went up to McNeil and shot him three times.

*Id.* at 593–94, 583 A.2d at 1047. The State also presented evidence of other crimes that Coleman's organization employed in order

> to preserve its territory and to protect its interests. The murder of one Maurice Ireland was traced to Givens. Ireland, fresh out of jail, was owed money by Holt, apparently

for some drug deal. He was "very pushy for his money [about $5000] to be paid back...." At one point, "[h]e forcibly tried to get his money back ... and as a result his murder was ordered." He was executed about a block from where McNeil was slain. Givens was charged with the murder of Ireland.

*Id.* at 594–95, 583 A.2d at 1048.

The prosecution witnesses were aware of these reasons to fear testifying against Coleman:

The media—press, radio, and television—provide clear indication that the extreme sanction employed by the drug organization here is not unusual. A harkening of the news reports shows that unlawful drug organizations often use that means to preserve the territory they have adopted, to enforce what they consider to be their rights, and to protect their interests. The impact of this on enforcement functions, [an officer] explained, is that there is great difficulty in locating witnesses who will cooperate with authorities in drug related offenses.

[Witnesses] are very candid, usually that they don't want to be involved because they fear that they will be hurt in retribution for any information that they would give to us. They fear the people that are involved in the murder and they will not give us a statement, let alone come to court and testify.

The officer emphasized:

These cases are usually very, very difficult to make an arrest on, very difficult because there is a low level of cooperation in the community because of the fear in the community. They fear these people. These people rule the communities through intimidation and ... these are citizens that ... don't want to be the next one laying out there in this street with nobody coming forward to testify for them.

*Id.* at 595, 583 A.2d at 1048.

Next, we summarized the evidence of threats specific to that case:

The police did ... receive information from the witnesses who were the subject of the protective order, one of whom was an eyewitness to the shooting. It was

specific information, and ... a positive identification of ... Givens was made as the shooter of ... McNeil. Also, there was information given relative to a conversation that was, that happened between ... Coleman and ... Givens just prior to the shooting of ... McNeil and also there was information as to actions of both individuals, what they did right before the shooting.

The witnesses agreed to testify in court, but not without reservations. [The officer] said:

... The biggest concern they had when I interviewed them was their personal safety. They are in extreme fear. They feel that if their identity is revealed that they would have to have 24 hour guard around the clock, but they feel like their life would not be worth a nickel. That's their words, extremely difficult to get people to come forward like this in these particular type cases and to give this kind of information and even more difficult, when you do get the information, for people to want to remain anonymous and not testify in court.

The officer observed that it is

[v]ery unusual for a person to put themselves this up front, so to speak, and be willing to go before the Baltimore City Grand Jury and come into a courtroom in front of whoever chooses to come in here and testify against an individual like this, an individual who is already indicted on two murders.

*Id.* at 595–96, 583 A.2d at 1048.

We also considered the potential for retaliation by criminal associates of the defendants:

[A]lthough Givens was in jail pending trial on Ireland's murder, ... Trayham, the organization's other enforcer, was still on the street. Also[,] police investigation indicated that Coleman was "sending emissaries from the Baltimore City Jail to issue harm to any of [the State's] witnesses."

Questioned as to the basis of the witnesses' fear that they would be killed, [the officer] said:

Because of the prior activities of this drug organization. People that have been shot and people that have been shot and killed. There are also people that have just been shot and have not died because they have crossed this particular drug organization and their death was ordered.

He explained:

Now, in some particular instances the murder wasn't complete. The person didn't die because the hospital saved them. They believe that if their identity is made known to this drug organization[,] they are not safe wherever they may be, whether it be under our protection.

The court remarked that this would be true even after they testified and the case was over. [The officer] responded:

Yes, it would be true.... To be quite candid, Your Honor[,] they are hoping that once the case is over the persons being tried will be incarcerated and then we would provide [the witnesses] with a means of leaving this area.

The judge inquired if the police would provide the witnesses with new identities. The officer replied the police did not have that capability, but, combined with the State's Attorney they would "do everything [they] can to help them leave the area."

*Id.* at 596–97, 583 A.2d at 1048–49.

The motion court in *Coleman* "determined that the officers' testimony was credible" and "that the fears for the safety of the witnesses were well warranted," because their lives "['lmay [have been] endangered[']" by their cooperation and testimony. *Id.* at 597, 583 A.2d at 1049. Concerned about "['lhampering the defense in any way in the preparation of [its] case,[']" however, the motion court required the State to provide defense counsel with the name of prosecution witnesses two weeks before trial, and to arrange for defense

counsel to "question the witnesses out of the presence of the State's Attorney." *Id.* The motion court explicitly prohibited defense counsel from disclosing the identity of these witnesses to anyone, including the defendants, but conditioned that order with the proviso that it would "[']consider at any time prior to trial any reasonable request that [was] made for time to pursue follow-up to any information that [was] obtained as a result of the interview.[']" *Id.* at 597–98, 583 A.2d at 1049. Finally, the motion court

> emphasized, "I am open at any time to considering reason-able requests from the defense for more time, more access or any other reasonable request." She pointed out:

>> I am still in control of this particular Order so that I can certainly modify it in the way that I have indicated to you that I would.

*Id.* at 598, 583 A.2d at 1049. The motion court's written order confirmed its bench ruling. *Id.* at 598–99, 583 A.2d at 1049–50.

When the case was called for trial, counsel for co-defendants Coleman and Givens immediately challenged the fairness of the proceeding on the grounds that the protective order denied their clients' rights to confrontation, due process, and fundamental fairness. *Id.* at 599, 583 A.2d at 1050.

> The rationale of those claims . . . was that "the State's whole case [was] going to rise and fall on the two witnesses who [were] being protected by this protective order." Not until the trial had commenced would the defendants be apprised of the identity of the witnesses so that defense counsel could ask the defendants "what do you know about this person, what dealings do you have with this person, who else knows about these dealings with this person, where can I find these other people who may or may not know about these things."

*Id.*

The trial court acknowledged the dilemma in not being able to discuss "[']the [m]ost important part of the State's case . . . with [a] client, get any input from [the] client to see if [the]

client may have information that could lead [counsel] to other information that may be helpful in [the client's] defense.[']" *Id.* at 600, 583 A.2d at 1050. Nevertheless, the trial court denied the motion to dismiss, but instructed that,

> after the cat is out of the bag or, in other words, after the witnesses have testified, if counsel for the defendants, as officers of the [c]ourt, find that there is a need for a day or two to track down additional witnesses, or to do further investigation to determine any possible motive or bias on behalf of these witnesses, the State's witnesses, then I will certainly permit that under the circumstances of this case.

*Id.* at 600–01, 583 A.2d at 1050–51.

Affirming Coleman and Givens' convictions, we held that the motion court did not abuse its discretion in issuing the protective order. *Id.* at 611, 583 A.2d at 1056. We found the rationale of *Brooks v. State,* 320 Md. 516, 578 A.2d 783 (1990), a case recognizing the need to protect the identity of confidential informants, equally applicable to cases in which there is a need to protect civilian witnesses:

> The privilege of the State to withhold certain matters from defendants in criminal causes has long been recognized, not only in Maryland but throughout the country. *Id.* at 522, 578 A.2d [at 786]. The privilege is especially important in the enforcement of narcotic laws, since it is most difficult to obtain evidence for prosecutions; there are rarely complaining witnesses. *Id.* The manifest importance of the State in nondisclosure is "necessarily circumscribed by the defendant's interest in a fair trial." [*Id.*] The privilege of non-disclosure must ordinarily give way where disclosure is essential to a fair determination of a cause. *Id.* at 522–523, 578 A.2d [at 786], citing *Roviaro* [,] 353 U.S. [at] 60–61, 77 S.Ct. [at] 627–28, 1 L.Ed.2d [at 645]. Trial judges are required "to balance the public interest in protecting the flow of information against the individual's right to prepare a defense." *Brooks* [,] 320 Md. at 523, 578 A.2d [at 787].
>
> "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each

case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

*Id.,* quoting *Roviaro,* 353 U.S. at 62, 77 S.Ct. at 629[, 1 L.Ed.2d at 646]. "[T]he balancing test should be applied in all cases." *Brooks,* 320 Md. at 525, 578 A.2d [at 788].

[T]he key element is ... the materiality of [the witness's] testimony to the determination of the accused's guilt or innocence balanced against the State's interest in protecting the identity of the [witness].

*Id.* "The decision to compel disclosure ... is within the sound discretion of the trial court." *Id.*

*Coleman, supra,* 321 Md. at 602–03, 583 A.2d at 1051–52 (citation omitted).

After conducting our own "independent constitutional appraisal of the confrontation and due process claims," we concluded that there was "no constitutional violation in the circumstances" and no "fundamental unfairness[.]" *Id.* at 604, 583 A.2d at 1052. We held that there was sufficient evidentiary grounds for the motion court to conclude that "the life of any State witness was in danger once the witness was identified[,]" and that the motion court "applied the proper test to the evidence, balancing the interest of the State and the interest of the defendants[.]" *Id.* at 603, 583 A.2d at 1052. One aspect of the motion court's exercise of discretion that we explicitly approved was the order permitting defense counsel to obtain names, addresses, and audiences with the protected witnesses, outside the presence of prosecutors, two weeks before trial. *Id.*

### Analysis

██ Here, unlike in *Coleman,* the State failed to present any evidence at the protective order hearing about the victim witnesses' testimony or the facts surrounding the alleged crime, other than the fact that it took place inside a home. With respect to the non-victim civilian witnesses, the State failed to present any evidence regarding their identity, their

expected testimony regarding Lancaster's alleged robbery, or the importance of that testimony to the State's case. Moreover, the State failed to present any evidence regarding "specific threats" from Lancaster, his brother, or their associates against the witnesses.[4] No evidence was presented regarding Lancaster's reputation for violence, or the reputation for violence, if any, of his brother and associates. The State also failed to identify any persons who might have carried out the alleged threats against the witnesses, as Lancaster and his brother were incarcerated at the time that the alleged threats were made. Because of these omissions, the motion court had no evidence upon which it could determine "the materiality of [the witnesses'] testimony to the determination of [Lancaster's] guilt or innocence[,]" or whether the disclosure of the identity and statements of witnesses to Lancaster "would entail a substantial risk of harm" to them. Hence, the motions court's finding that "there [was] a significant issue with respect to the safety and welfare of [the State's] witnesses ... and the ... reasonable fear with respect to their personal safety and prospect of retaliation" is clearly erroneous. *See Coleman, supra,* 321 Md. at 603, 583 A.2d at 1052 (applying a clearly erroneous standard to the review of the motion court's conclusion that "the life of any State witness was in danger once the witness was identified").

■■ We further conclude that the protective order "in effect tied [defense] counsel's hands and foreclosed him from pursuing a valuable source of information" for cross-examina-

---

4. The intermediate appellate court concluded: "According to Det. Mason, an unidentified female witness feared for her safety and that of her young daughter as a result of conversations that associates of the Lancasters had with her and her family members, in which the associates asked about the child's welfare." *Lancaster,* 180 Md.App. at 30, 948 A.2d at 118. But, as the State concedes, the record does not contain any evidence supporting this statement. The intermediate appellate court also concluded that, at the protective order hearing, the detective testified that "once police began questioning [Hutson], Pablo ... repeatedly warned [her] to 'watch out.' " *Id.* at 30, 948 A.2d at 119. The record of the protective order hearing does not reflect any such testimony.

tion of the State's witnesses. *Clark v. State*, 306 Md. 483, 489, 510 A.2d 243, 246 (1986), *cert. denied*, 479 U.S. 1084, 107 S.Ct. 1286, 94 L.Ed.2d 144 (1987). The main and essential purpose of confrontation of witnesses is to secure for a defendant the opportunity of cross-examination. Cross-examination is the principal mechanism by which the defense tests witness credibility and the truth of witness statements before the trier of fact. It is used not only to test a witness's memory and perceptions of what occurred, but also to impeach or discredit a witness's testimony. Here, because the protective order placed a marked restraint upon defense counsel's tactical or strategic judgment, it impaired defense counsel's effectiveness, violating Lancaster's right to the assistance of counsel. *Id.* at 488, 510 A.2d at 245 ("counsel's effectiveness is impaired by action of the court or the state placing a marked restraint upon counsel's tactical or strategic judgment"). Because the protective order violated Lancaster's right to the effective assistance of counsel, the motion court abused its discretion by issuing the protective order.

■ The State contends that "Lancaster waived any complaint with respect to the protective order [by] agree[ing] to the course of action proposed by the [motion] court and made no further objection to the order after the hearing, either prior to . . . or during trial." *See Rocks, supra*, 241 Md. at 630, 217 A.2d at 541. This contention is unpersuasive. At the time that the motion court issued the protective order, Lancaster made known his objection to the issuance of the order. *See* Rule 4–323(c) ("For purposes of review . . . on appeal of any . . . ruling or order [other than an objection to evidence], it is sufficient that a party, at the time [that] the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court."). "[H]aving vigorously argued the matter," defense counsel's "polite deference" to the motion court cannot be "deem[ed] acquiescence[.]" *Beverly v. State*, 349 Md. 106, 118, 707 A.2d 91, 97 (1998).

The State further contends that "Lancaster fails ... to show prejudice based on the ... protective order[,]" and that even if he was prejudiced, any abuse of discretion by the motion court was harmless beyond a reasonable doubt. *See Dorsey, supra,* 276 Md. at 659, 350 A.2d at 678. But, Lancaster does not need to prove that he was prejudiced by the protective order. "[W]here the state deprives [a] defendant of effective assistance of counsel, constitutional error will be found without the showing of prejudice." *Clark, supra,* 306 Md. at 491, 510 A.2d at 247 (citations omitted). Moreover, the right to counsel is one of the "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error[.]" *Chapman v. California,* 386 U.S. 18, 23 and n. 8, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705, 710 (1967). Additionally, because the witnesses and defendants in this case apparently knew each other, cross-examination of the witnesses on the issue of bias could have revealed a motive to testify falsely. Lancaster could not have ascertained such motives unless he knew the identities of the witnesses, and hence, the motion court's abuse of discretion in issuing the protective order was not harmless beyond a reasonable doubt.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

HARRELL, MURPHY, and RODOWSKY, JJ., Dissent.

Dissenting Opinion by MURPHY, J., which HARRELL and RODOWSKY, JJ., join.

While I agree with the majority that the "clearly erroneous" standard of review is the applicable standard in the case at bar, I am persuaded that there are two reasons why the

Petitioner is not entitled to new trial. First, because the Circuit Court expressly stated that it would revisit the protective order issue if requested to do so, that order constituted an *in limine* ruling that was not thereafter preserved for appellate review. As the Court of Special Appeals stated:

The motion court acknowledged the possibility that, after reviewing [the protected] information, defense counsel might find a need to discuss an aspect of the protected information with his client before the trial, in order to determine plea and trial strategy. Lancaster reads the court's order, however, as limiting the "the type of clarification and modification it would consider . . . to circumstances in which witness statements and identities could be shared with Lancaster 'without him being able to determine the witness' identification.' " After reviewing the bench ruling and written order in context, we conclude that Lancaster construes it too narrowly. The motion court explicitly invited defense counsel to seek reconsideration and/or clarification of the protective order in the event counsel developed a specific concern following disclosure of the protected information to counsel.

Defense counsel had the protected information for nearly two months before trial, but did not seek modification or clarification of the protective order as it pertained to any of the disclosed information. *Cf. United States v. Padilla*, 203 F.3d 156 (2d Cir.)(protective order temporarily barring counsel from informing clients about investigation into allegations of witness and jury tampering was lifted when it became relevant to their witness-selection decisions and to the nature of the anticipated cross-examination if defendants were to testify), *cert. denied*, 531 U.S. 832, 121 S.Ct. 86, 148 L.Ed.2d 47 (2000). There is nothing in the record to suggest that counsel approached the prosecutor in this regard, either, despite the court's suggestion of that alternative possibility. In these circumstances, we think that the failure to request relief from the protective order severely undermines Lancaster's complaint about it. *See, e.g., Coleman [v. State]*, 321 Md. [586] at 604[, 583 A.2d 1044, 1052

(1991)] (appellate court's decision that protective order delaying disclosure of prosecution witness information until trial did not violate defendant's constitutional rights was "bolstered by the fact that" defendant did not request time for additional investigation even though the court assured counsel that additional time would be granted if the defense found that "to be advisable as a result of the testimony of [protected] witnesses at trial").

*Lancaster v. State,* 180 Md.App. 1, 27–28, 948 A.2d 102, 117–18 (2008).

Second, when the protective order expired on the date of trial, Petitioner's trial counsel had an opportunity to—but did not—explain how the defense was prejudiced by the tardy disclosure of the protected information. Because no explanation was provided and no request for relief was presented to the Circuit Court, I would affirm the judgment of the Court of Special Appeals.

Judges HARRELL and RODOWSKY have authorized me to state that they join this dissent.